GEORGE F. BRADLEY & others *vs*. FREDERICK W. BORDEN & others.

Suffolk.   January 19, 20, 1916. — April 21, 1916.

Present: RUGG, C. J., BRALEY, PIERCE, & CARROLL, JJ.

*Equity Pleading and Practice*, Reference to master, Motion to recommit, Premature suit.  *Voluntary Association.  Syndicate.  Contract*, Construction, Consideration.  *Equity Jurisdiction*, For an accounting.

Where a suit in equity is referred to a master with an order to report his findings of fact and rulings of law, his report of rulings of law is advisory.

Where by consent of the parties a suit in equity is referred to a master "to hear the parties and their evidence, to find the facts, decide the case, and report thereon to the court," the master has authority to report not only his findings of fact but also his rulings of law.

Where a suit in equity was referred to a master under the rule quoted above, and the master stated in his report, "The scope of the rule has been questioned by the parties, and I have interpreted the same to direct me to determine matters of law as well as matters of fact, and to make such findings as would have been made by a justice of this court had the case been heard by the court," and where a motion to recommit the report to the master was denied by the single justice who heard the case, it was *held*, that, although the statement of the master was not strictly accurate, yet, when limited to its meaning in connection with other parts of the rule, it was essentially correct, and that at any rate the objecting party was not harmed by it, so that the denial of the motion to recommit was right whether considered as a matter of discretion or as a matter of law.

Where a voluntary association, called a syndicate, was formed by an agreement between the subscribers and a governing board, called the syndicate managers, and the purpose of the syndicate was declared in the agreement to be the acquiring through a contract held by a certain corporation of fifty-two per cent of the capital stock of a certain copper company, "also for the purpose of purchasing remaining stock of said [copper company]; of providing additional working capital for continuing and developing the business of said [copper company] and of developing the property owned and controlled by said company, or which may be at any time acquired by it," it was *held*, that the words "remaining stock" as used above meant remaining outstanding stock.

By the syndicate agreement named above it was provided that "The syndicate managers shall have the sole direction and management and the entire conduct of the transaction and business of the syndicate; they are authorized to vote and act in respect of all stocks held by it, and to do any and all things by them in their sole and absolute discretion deemed proper, necessary or expedient to carry out the purposes of this agreement."  Under this and other clauses of the agreement, it was *held*, that the syndicate managers had authority to employ a certain expert and pay him for information valuable and necessary for a complete understanding of the business of the copper company.

It also was *held* that the syndicate managers had no authority to set aside certain shares of stock to be delivered to certain persons as a reward for faithful past services, such recognition of a moral obligation not being within the "purposes" of the agreement.

It also was *held* that the syndicate managers had no authority to grant an option to purchase certain shares of stock to another person in consideration of present service and future service to be rendered, the "present" service having been rendered voluntarily and the grantee of the option being under no binding agreement to render any service in the future.

The syndicate agreement above described contained the following provision in regard to the termination of the syndicate: "Unless the object of the syndicate shall be sooner attained as determined by the syndicate managers in their discretion, the syndicate shall remain in force for a period of three years from the date hereof. . . . Thereupon the affairs of the syndicate shall be wound up by the syndicate managers and the net proceeds in cash or securities, including all dividends and interest received, shall be distributed *pro rata* among the subscribers not in default." In the last of the three years thus provided for the existence of the syndicate, the syndicate managers by proper votes and by acts in pursuance of them, under circumstances which made such action necessary for the purposes of the syndicate agreement, caused to be issued by the copper company $150,000 of its income bonds and issued, as a bonus distributed *pro rata* to the purchasers of these bonds, twenty thousand, five hundred shares of stock of the copper company, placing the remainder of the stock of that company owned by the syndicate in a voting trust for a period of three years or until such time as the income bonds should be redeemed by the copper company. *Held*, that these acts, performed by the syndicate managers in good faith, were a proper exercise of "their sole and absolute discretion," there being no provision in the syndicate agreement that, when the affairs of the syndicate should be wound up by the syndicate managers at the end of the three years, there should be any distribution of the shares of stock of the copper company *in specie* to the subscribers.

Three days after the expiration of the term of three years provided for in the syndicate agreement above described, certain subscribers to the syndicate filed a bill in equity against the syndicate managers, praying for a winding up of the syndicate and the distribution of its property among the subscribers. A master to whom the case was referred found "that a reasonable time for winding up the affairs of the syndicate, after the time when it terminated by the terms of the agreement, was one month after" the day of termination. *Held*, that the suit was brought prematurely, as the defendants at the time it was brought were under no obligation to account to the plaintiffs.

BILL IN EQUITY, filed in the Supreme Judicial Court on October 23, 1912, by subscribers under a certain agreement dated October 20, 1909, called the "Syndicate Agreement," against certain persons called the "Syndicate Managers," who were the parties of the first part in such syndicate agreement, and the Butte Central Copper Company, a corporation organized under the laws of the State of Delaware, having a usual place of business in Boston

and owning and operating certain mining properties in the State of Montana, also against the First National Bank of Boston, a United States corporation having its principal place of business in Boston, and the Federal Trust Company, a corporation organized under the laws of this Commonwealth and having its usual place of business in Boston, alleging that the term of existence of the syndicate agreement expired on October 20, 1912, and that the plaintiffs were entitled to have the affairs of the syndicate wound up and to an accounting by the syndicate managers for their administration of the property of the syndicate and to the distribution of the shares of stock and other property of the syndicate among the plaintiffs and others who were the subscribers and the parties of the second part under the syndicate agreement; and that the defendant syndicate managers, regardless of their fiduciary relation to the plaintiffs and others, had mismanaged the property of the syndicate and wrongfully had disposed of a part of it as more particularly set forth in the bill. The prayers of the bill were, (1) that the defendant Federal Trust Company be restrained until further order of the court from taking any action under an agreement or contract made between it and the defendant syndicate managers, (2) that the defendant First National Bank be restrained until further order of the court from disposing by transfer or otherwise of the whole or any part of the shares of stock of the Butte Central Copper Company held or controlled by it and originally delivered to it in accordance with the syndicate agreement, (3) that the defendant Butte Central Copper Company be restrained until further order of the court from permitting any transfer of the shares of its capital stock which were purchased from it by Sir Frederick W. Borden and others under or in connection with the syndicate agreement and another agreement of January 7, 1910, (4) that the other defendants be restrained until further order of the court as individuals and as syndicate managers and parties of the first part to the syndicate agreement from selling or otherwise disposing of any shares of stock or other property belonging to the parties of the second part under that agreement, (5) for a temporary receiver of the property, moneys and effects belonging to the parties to the syndicate agreement, (6) for a permanent receiver of such property, (7) for further relief and (8) for further relief against the defend-

ants Butte Central Copper Company, First National Bank of Boston and Federal Trust Company either jointly or severally.

Lemuel E. Demelman, one of the defendants to the original bill, filed a cross bill by leave of court on July 25, 1913, praying that he might be granted the same relief granted to the plaintiffs in the original bill and for an accounting between him and the other defendants named in the original bill. Later, upon the suggestion of the death of Demelman, motions were granted making the executors of his will defendants to the original bill and plaintiffs in the cross bill.

Adolph Leve, another of the defendants to the original bill, also filed a cross bill by leave of court on July 25, 1913, praying for like relief.

The reference of the case to a master is described in the opinion. The denial of the motion to recommit the master's report there mentioned was by *Crosby,* J.

The syndicate agreement as stated in the master's report was as follows, the numbers of the paragraphs having been added by the master for convenience of reference:

"[1] AGREEMENT dated the twentieth day of October, 1909, by and between SIR FREDERICK W. BORDEN, LESLIE S. MACOUN, MARK WORKMAN, ALFRED R. TURNER, CHARLES A. HENDERSON, FREDERICK J. BOWLES, FREEMAN I. DAVISON, WILLARD E. ROBINSON, WILLIAM H. NORTH, LEMUEL E. DEMELMAN, hereinafter called the 'Syndicate Managers,' parties of the first part, and THE SUBSCRIBERS HERETO, severally, parties of the second part (of whom each is hereinafter termed a 'Subscriber'), and all of whom, together with the said parties of the first part, constitute the Syndicate.

"[2] WHEREAS, The International Underwriting Company holds a contract for the purchase of 52 per cent. of the capital stock of the Butte Central Copper Company, a corporation duly created and existing under the laws of the State of Delaware; and

"[3] WHEREAS, the parties of the first and second parts hereto desire to form a Syndicate for the purpose of acquiring from said International Underwriting Company their rights under said contract for the purchase of the stock aforesaid; and also for the purpose of purchasing remaining stock of said Butte Central Copper Company; of providing additional working capital for con-

tinuing and developing the business of said Butte Central Copper Company and of developing the property owned and controlled by said Company, or which may be at any time acquired by it;

"[4] Now, THIS AGREEMENT WITNESSETH: That in consideration of the premises and of the mutual promises herein contained, the parties hereto agree, and the Subscribers severally agree with each other and with the Syndicate Managers, as follows:

"[5] The parties aforesaid hereby form a Syndicate for the purpose herein expressed, and with a maximum capital of Two Hundred Thousand Dollars ($200,000.00), and the Subscribers severally subscribe to the said capital the sum written opposite their names, respectively, at the foot of this agreement, and each for himself hereby promises and agrees to and with the others and each of them, and to and with the Syndicate Managers, and their successors and assigns, to pay the said sum so subscribed, on call of the Syndicate Managers, to the First National Bank at its office in the City of Boston, or such other depository as the Syndicate Managers may designate as Depository, for account and subject to the order of the Syndicate Managers.

"[6] Payment of subscriptions shall be made as follows: 25 per cent upon call, and the balance when and as called by the Syndicate Managers.

"[7] Each Subscriber shall be entitled to receive for all payments made hereunder when and as called by said Syndicate Managers a suitable receipt or certificate entitling the Subscriber (not being in default hereunder) to participate *pro rata* in the benefits of the Syndicate hereby formed and to receive securities or cash when the Syndicate Managers shall be able or shall determine to distribute or deliver the same.

"[8] Each Subscriber shall be liable solely to the Syndicate Managers, and their successors and assigns, and only to the extent of his individual participation in the Syndicate and the amount subscribed hereto; nothing contained in this agreement or otherwise shall constitute the Subscribers partners with or agents for one another, or with or for the Syndicate Managers, or render them liable to contribute in any event more than their individual subscription.

"[9] All moneys paid hereunder shall be used by the Syndicate Managers for the aforesaid plan, including the payment of all charges

and expenses connected therewith, but the Depository shall not be under any liability in respect to the application of such moneys.

"[10] Unless the object of the Syndicate shall be sooner attained as determined by the Syndicate Managers in their discretion, the Syndicate shall remain in force for a period of three years from the date hereof. It may be terminated by the Syndicate Managers in their discretion at any time, and upon request of at least two-thirds in interest of the Subscribers it shall be terminated upon sixty days' written notice to the Syndicate Managers. Thereupon the affairs of the Syndicate shall be wound up by the Syndicate Managers and the net proceeds in cash or securities, including all dividends and interest received, shall be distributed *pro rata* among the Subscribers not in default. This agreement shall bind and benefit ratably, according to the amount of their respective subscriptions, not only the parties hereto, but their respective successors, assigns or personal representatives.

"[11] The Syndicate Managers shall have the sole direction and management and the entire conduct of the transaction and business of the Syndicate; they are authorized to vote and act in respect of all stocks held by it, and to do any and all things by them in their sole and absolute discretion deemed proper, necessary or expedient to carry out the purposes of this agreement.

"[12] Each Subscriber hereby ratifies, assents to and agrees to be bound by any action of the Syndicate Managers taken under this agreement, and agrees to perform his undertakings hereunder from time to time promptly on call of the Syndicate Managers, to the full extent of the amount set opposite his signature hereto; but in no event and under no circumstances in excess thereof. The failure of any Subscriber to perform any of his undertakings hereunder shall not affect or release any other Subscriber. In case of the failure of any Subscriber to perform any of his undertakings hereunder, the Syndicate Managers may allow other persons or corporations to take the share of participation of the Subscriber so failing to perform his undertakings.

"[13] Upon the failure of any Subscriber to perform any of his undertakings hereunder, the Syndicate Managers shall have the right at their option and in their discretion to exclude such Subscriber from further interest and participation in the Syndicate, and to forfeit any payments he may have theretofore

made hereunder, and to hold him liable for and recover all damages caused to the Syndicate by his failure to perform.

"[14] It is understood and agreed that the Syndicate Managers shall not be liable under any of the provisions of this agreement, nor in, nor for any matter or thing connected therewith, except for their individual want of good faith or wilful negligence.

"[15] It is understood and agreed that the Syndicate Managers may act by a majority of their number and may appoint officers, who shall be authorized by resolution of the Syndicate Managers to draw against the funds to the credit of the Syndicate Managers with the Depository, and that they may associate with themselves additional Syndicate Managers; provided, however, that not more than fifteen (15) Syndicate Managers in all shall be appointed. Additional Syndicate Managers so appointed shall have all the powers and obligations of the Managers originally named. No action shall be taken by said Syndicate Managers except at meetings duly called and held pursuant to rules adopted by the Managers, and copies of said rules, as adopted, shall be mailed to each Syndicate Subscriber. In the event of the death, resignation or incapacity of any Syndicate Manager, the remainder shall have power to select his successor, and such successor shall have the same rights, powers and obligations as if originally named herein.

"[16] It is further understood and agreed that the Syndicate Managers, or any of them, may become Subscribers hereunder in the same manner and with the same rights and obligations as other Subscribers; and that any Syndicate Manager may contract with the others or with any new Company that may be formed hereunder.

"[17] An original of this Agreement shall be signed by the Syndicate Managers and deposited with the First National Bank of Boston, the Depository hereunder, and counterparts hereof may be signed by Subscribers and retained by the Syndicate Managers, and all shall be taken and deemed one original instrument.

"[18] IN WITNESS WHEREOF, the Syndicate Managers, parties of the first part hereto, have subscribed an original hereof, and have lodged the same with the Depository hereunder, and the Subscribers, parties of the second part hereto, have subscribed said original, or a counterpart hereto, as of the day and year first above written.

Subscriber         Address        Amount Syndicate
                                       Participation"

The signatures of the subscribers were secured upon some thirty or more originals in the above form which collectively constituted the agreement.

On January 10, 1910, the syndicate managers, having signed the agreement, met and organized, and adopted rules by which they should be governed.

The essential findings of the master are quoted or described in the opinion.

The following are the plaintiffs' exceptions to the master's report which are mentioned in the opinion:

"9. Because the master fails to explain the distinction between the powers of the syndicate managers in making a gift of stock to the McConnells of 2,500 shares, which he says was wrong, and in making a gift of 20,500 shares of stock to the Butte Central Copper Company, which he says was right."

"11. Because the master has ruled or found that syndicate managers were authorized by the terms of the syndicate agreement to appropriate or transfer 20,500 shares of stock to Butte Central Copper Company, held pursuant to the provisions of the syndicate agreement, to provide additional working capital for the Butte Central Copper Company.

"12. Because the master has found that the syndicate managers who were present at the meeting appropriating the 20,500 shares of stock voted in the belief that they were acting for the best interests of the syndicate, and within the powers conferred upon them by the syndicate agreement."

"19. Because the master has ruled or found that when the defendant syndicate managers voted to appropriate 20,500 shares of the syndicate stock for the benefit of the Butte Central Copper Company, at a meeting held on March 9, 1912, and at the same time voted to tie up, by means of the Federal Trust Company agreement, the 99,282 shares of stock, part of the 130,000 shares, after deducting the said 20,500 shares, that the vote as to said 99,282 shares and the subsequent making of the Federal Trust Company agreement (seemingly because both votes appear in one sentence in the record, or 'passed at same time as part of same scheme') was valid.

"20. Because the master has ruled or found that the defendant syndicate managers were authorized to dispose of the 20,500 shares

of stock, and cause the same to be transferred to the Butte Central Copper Company to be sold or disposed of in connection with the income bonds.

"21. Because the master has ruled or found that the syndicate managers were authorized by the terms of the syndicate agreement to enter into the Federal Trust Company agreement, tying up 99,282 shares of syndicate stock for substantially two years and a half after the syndicate agreement by force and effect of its terms expired, in order to provide additional working capital for the Butte Central Copper Company.

"22. Because the master has ruled or found that the defendant syndicate managers were authorized to continue the syndicate agreement after October 20, 1912.

"23. Because the master has ruled or found that the plaintiffs were not entitled to a winding up of the syndicate within a reasonable time after October 20, 1912, and consequent distribution *pro rata* of the 130,000 shares of stock held for the benefit of the syndicate subscribers pursuant to the provisions of syndicate agreement.

"24. Because (aside from the validity of the appropriation of the 20,500 shares of stock above referred to) the master has ruled or found that the plaintiffs were not entitled to a distribution *pro rata* of the shares of stock then held by the syndicate on October 20, 1912, or within a reasonable time thereafter.

"25. Because the master has ruled or found that the defendant syndicate managers were authorized or justified in paying Creden, the expert, $750."

"28. Because the master has failed to rule or find that the call for the meeting of March 9, 1912, of the syndicate managers did not empower the syndicate managers to pass the votes at said meeting in reference to the appropriation for the benefit of the Butte Central Copper Company of 20,500 shares of stock and the vote authorizing the agreement with the Federal Trust Company.

"29. Because the master has failed to rule or find that, because of the failure to distribute the 10,218 shares, the syndicate managers became liable in damages to the plaintiffs for the fair market value of said stock.

"30. Because the master has failed to rule or find, either as a

matter of law or matter of fact, that, aside from the block of 20,500 shares and the block of 99,282 shares, the syndicate managers had in their control at the First National Bank 10,218 shares which they should have distributed *pro rata* to the various subscribers of the syndicate agreement within a reasonable time after October 20, 1912.

"31. Because also the master has failed to rule or find as a matter of fact or as a matter of law the rights of the parties plaintiff in connection with 2,718 shares of stock which was part and parcel of the syndicate stock of 130,000 shares."

"39. Because the master has ruled or found that the placing of the stock in trust with the Federal Trust Company by the syndicate managers is valid, because it is included 'in and made a part of the same scheme, by which the additional working capital was to be raised for the company.'"

"41. Because (aside from the master's ruling that the plaintiffs are entitled to injunctive relief enjoining the syndicate managers, First National Bank, and Federal Trust Company from disposing of the shares of stock under the Clinton option [5,000 shares], and to the McConnells by way of gift [2,500 shares]) the master has failed to rule or find, either as a matter of law or as a matter of fact, as to how far or to what extent the defendants, or any of them, are liable to the plaintiffs as to the stock which relates to the Clinton option and the stock which relates to the McConnell transaction, amounting in all to 7,500 shares."

The case came on to be heard before *Pierce*, J., upon the master's report and the exceptions thereto, and thereupon the justice reserved the case for determination by the full court upon the bill, answers and replication, the cross bill of Demelman and the amendment thereto and the order allowing it, the appeal therefrom, the answers to the cross bill, the replication to the cross bill, the cross bill of Leve, the answers and replication to such cross bill, the rules to the master on the bill and the cross bills, the master's report and exceptions thereto, the motions of the plaintiffs and of Demelman to recommit the master's report, the interlocutory decrees denying the motions, and the appeals therefrom, and the motions and orders for substituting the executors of the will of Demelman as parties defendant and as plaintiffs in the cross bill.

*H. T. Richardson,* for the plaintiffs.

*W. N. Buffum,* (*E. M. Schwarzenberg* with him,) for the executors of the will of Lemuel E. Demelman.

*W. R. Tillinghast* (of Rhode Island) & *Lee M. Friedman,* (*A. E. Burr* with them,) for the defendants Sir Frederick W. Borden and others.

*A. C. Burnham,* for the First National Bank of Boston.

*J. P. Fagan,* for the Federal Trust Company, submitted a brief.

PIERCE, J. This case by consent of the parties was referred to the master without objection to or appeal from the terms of the order, which read, "And now it is ordered that the above-entitled cause be referred to Walter F. Frederick, Esquire, as master, to hear the parties and their evidence, to find the facts, decide the case, and report thereon to the court."

The rule in the cross bill read, "In the above entitled cause it is ordered that the cross bill and pleadings therein be referred to Walter F. Frederick, Esq., as master, to hear the parties and their evidence, to find the facts, and report the same to the court."

As regards the first rule, the master in his report states: "The scope of the rule has been questioned by the parties, and I have interpreted the same to direct me to determine matters of law as well as matters of fact, and to make such findings as would have been made by a justice of this court had the case been heard by the court."

Upon the coming in of the report the plaintiffs moved to recommit

"(a) Because the master has not interpreted correctly the rule to him as master, and also has exceeded the powers delegated to him under said rule.

"(b) Because the master has neither authority to determine matters of law nor 'to make such findings as would have been made by a justice of this court had the case been heard by the court.'

"(c) Because the master should have heard the parties and their evidence and reported the facts to the court, and should not and is not justified in making rulings of law.

"(d) Because the master has exceeded his authority as such in making rulings of law.

"(e) Because the master's report should be reformed or recon-

structed, omitting all rulings of law made by him, because he had no authority or right to make such rulings of law."

This motion was denied and the plaintiffs appealed.

The same question of law in identical language is presented by objections and exceptions duly taken and filed.

The plaintiffs argue that "A master has no jurisdictional authority to make rulings of law, even if the court attempts to clothe him with such authority" and cites *New England Foundation Co. v. Reed*, 209 Mass. 556, *Adams v. Young*, 200 Mass. 588, 590, *Clark v. Seagraves*, 186 Mass. 430, 435. In no one of these cases did the rule direct the master to do more than to hear the parties, to take the evidence and to report his findings of fact. They are authority for the position that the power of the master as well as its limitation is to be found in the terms of the rule and consequently that a direction to hear evidence and report facts excludes by necessary implication the right to make rulings of law. The court with or without the consent of parties has authority to have the assistance of a master in the determination of any question of law or of fact necessary or useful to the decision of any pending issue. The right to have the opinion of a master upon conclusions of fact arrived at upon consideration of offered and received evidence necessarily carries with it the right to know upon what theory of law the master acted in arriving at any conclusion of fact or of law to the end that the court may be enabled to determine whether the report shall be accepted or rejected or the whole matter of reference be recommitted to the same or to another master for further hearing upon direction as to the law to be followed. The report of rulings of law is advisory, while findings of fact in the absence of a report of all the material evidence have the weight of a special verdict of a jury. The direction to report findings of fact and rulings of law is not uncommon and the right of the court so to order has, so far as appears by any decision, hitherto stood unquestioned in this Commonwealth. See *Moore v. Dick*, 187 Mass. 207; *Warfield v. Adams*, 215 Mass. 506. Cases like *Clark v. Seagraves*, 186 Mass. 430, and *Hittinger Fruit Co. v. Cambridge*, 218 Mass. 220, where the direction in substance was to "report such facts and questions of law as either party may request," are distinguishable because of the limitation of the master's authority contained in the rule. Without consent of parties the court has

no authority to refer the entire decision of the whole case, but with consent such has long been the practice in equity and at law. *Kimberly* v. *Arms,* 129 U. S. 512. *Davis* v. *Schwartz,* 155 U. S. 631, 636. *Gardner* v. *Boston,* 120 Mass. 266. *Electric Supply & Maintenance Co.* v. *Conway Electric Light & Power Co.* 186 Mass. 449, 451.

The master's statement that the rule conferred authority "to make such findings as would have been made by a justice of this court" is inaccurate when taken apart from its connection with other parts of the rule, but so read and limited is in essence true.

In any event, no harm resulted and the question of the degree of the judicial function of the master does not require decision.

The question of jurisdiction under the facts is not open; the refusal to recommit as a matter of discretion or as a matter of law was correct and should be affirmed, and the exceptions overruled.

The plaintiffs contend that the clause in paragraph [3] of the agreement reading, "and also for the purpose of purchasing remaining stock of said Butte Central Copper Company;" should be read in connection with and as a part of the clause that directly follows it, first striking out the semicolon, and then inserting before the word "of" the copulative word "and," or inserting before the word "providing" either the word "thereby" or "thus" after striking out the semicolon and the word "of." Thus amended the combined clauses would read, "and also for the purpose of purchasing remaining stock of said Butte Central Copper Company" "and of," "thereby" or "thus" "providing additional working capital for continuing and developing the business of said Butte Central Copper Company and of developing the property owned and controlled by said company, or which may be at any time acquired by it."

The plaintiffs also assert that there was no "remaining stock" after the acquisition of all the treasury stock (one hundred and twenty-five thousand shares) of the company. This construction would leave the clause without force, and would limit the words to description of stock owned by the company after it had disposed of all that it had — a manifest absurdity. The words "remaining stock" under the circumstance should be read remaining outstanding stock, and so read can be given effect and are consistent with the gift or sale of the Davidson stock to the

company (five thousand shares) which was needed to make the holding of the syndicate fifty-two per cent of the capital stock of the Butte Central Copper Company.

Should the clauses be combined and interpreted as the plaintiffs argue ought to be done, the words "additional working capital" naturally would mean the cash paid to the copper company by the syndicate for the one hundred and thirty thousand shares of its stock.

The circumstances existing at the time of the making of the agreement do not require the expunging of the punctuation or the addition of words to the agreement to make certain the intention of the parties to it.

As stated in the paragraphs of the agreement numbered by the master [2] and [3] the syndicate was formed for three purposes:

(a) "For the purpose of acquiring from said International Underwriting Company their rights in 52 per cent, of the capital stock of the Butte Central Copper Company under a contract held by the International Underwriting Company for the purchase of the stock."

(b) "And also for the purpose of purchasing remaining stock of said Butte Central Copper Company."

(c) "Of providing additional working capital for continuing and developing the business of said Butte Central Copper Company and of developing the property owned and controlled by said company, or which may be at any time acquired by it."

That something more than mere stock control of the Butte Central Copper Company was contemplated by the syndicate subscribers is made clear by the provision for a board of managers of "not more than fifteen" with officers, executive committee and power to expend money and make contracts; as also by the provision [8] that "nothing contained in this agreement or otherwise shall constitute the subscribers partners with or agents for one another, or with or for the syndicate managers, or render them liable to contribute in any event more than their individual subscription;" as also by the provision [11], that "The syndicate managers shall have the sole direction and management and the entire conduct of the transaction and business of the syndicate; they are authorized to vote and act in respect of all stocks

held by it, and to do any and all things by them in their sole and absolute discretion deemed proper, necessary or expedient to carry out the purposes of this agreement;" as also by paragraph [15] ". . . No action shall be taken by said syndicate managers except at meetings duly called and held pursuant to rules adopted by the managers, and copies of said rules, as adopted, shall be mailed to each syndicate subscriber."

Among the rules adopted was Article IV, which provided for an executive committee and defined its powers: Section 2. "(a) If, as contemplated in the syndicate agreement, the syndicate acquires an interest in the majority of the stock of the Butte Central Copper Company, the executive committee shall have power to act in an advisory capacity with the officers of that company as to any and all matters connected with the administration of the company and the transaction and development of its ordinary and regular business. (b) The committee shall have power, without authorization of the managers, to incur and direct the payment of expenses and disbursements for all such investigations and examinations by counsel, accountants or other experts and for such incidental expenses as it may deem necessary."

The words "to do any and all things by them in their sole and absolute discretion deemed proper, necessary or expedient to carry out the purposes of this agreement" conferred upon the managers the highest possible power. This discretion and authority, always supposing that there is no *mala fides* with regard to its exercise, is without any check or control from any superior tribunal. *Gisborne* v. *Gisborne*, 2 App. Cas. 300. *Tempest* v. *Camoys*, 21 Ch. D. 571.

The plaintiffs' exception number twenty-five, is founded upon their contention that the syndicate managers were not authorized or justified in paying one Creden $750 for expert service. It appears that Creden had prepared and submitted to the copper company a partial report of the "values of the ore bodies;" that it was the opinion of the managers that "it would be in the interests of the syndicate and would greatly aid in the carrying out of the purposes of the syndicate" to have such report made complete. Accordingly, the managers directed the employment of Creden, and paid for his services when rendered to the syndicate.

Manifestly such information was valuable and necessary to a proper and complete understanding of the business of the copper company and especially to the executive committee, whose business it was "to act in an advisory capacity with the officers of the [copper] company as to all matters connected with the administration of the company."

We are of opinion that the employment of Creden was within the scope of the duties and powers imposed and conferred upon the syndicate managers, and the exception must be overruled.

The plaintiffs' exceptions twenty-nine, thirty, thirty-one and forty-one require consideration of the managers' vote to transfer shares of stock to McConnell and to Clinton.

The vote to set aside twenty-five hundred shares of stock, to be delivered to the McConnells at the termination of the syndicate agreement in recognition of faithful past service rendered to the copper company and to the syndicate would have been a commendable recognition of a moral obligation in the syndicate or in the company, but so far as any evidence discloses would have no direct relation to the "purposes" of the syndicate or in any manner contribute to the success of the business of the company or syndicate. It follows that the vote of the managers was without authority and was void.

The vote whereby an option was granted to Robert L. Clinton to purchase at any time before the termination of the syndicate agreement five thousand shares of stock at an agreed price was stated to be upon the consideration of present service and future service to be rendered. There was no legal obligation to pay for such services as Clinton had voluntarily rendered in the past and no binding agreement upon him to render any in the future. This vote was also without authority, and was void.

On March 2, 1912, the secretary of the syndicate managers sent out notices of a meeting of the managers called for March 9, 1912, which stated that the meeting was called for the purpose, among others, of "3. Considering and taking action on ways and means of aiding the Butte Central Copper Company to procure additional funds required to install the proposed mill at the mine."

At a meeting of all the syndicate managers, held on December 2, 1911, it was "Voted that the Syndicate hereby approves and recommends the installation of a suitable concentrating mill at

the Ophir Mine, if all the Directors of the Butte Central Copper Company shall determine that such installation is necessary for the best interests of the Company." This vote of. the syndicate managers presumably was taken upon a favorable "completed" report of the expert Creden and upon another report of some "competent mining engineer" as such was directed to be obtained by the vote of the syndicate managers passed June 14, 1910, and was received and paid for subsequent to October 27, 1910.

At the annual stockholders' meeting of the Butte Central Copper Company, held on February 14, 1912, the board of directors, then elected, were authorized to issue income bonds limited to the amount of $150,000 in the aggregate to provide funds for the installing of a mill for the treatment of ores at the mine, if in their judgment it appeared to be for the best interest of the company.

At the meeting of the syndicate managers held on March 9, 1912, pursuant to the notice of March 2, 1912, after the secretary had made a statement of the action of the stockholders of the Butte Central Copper Company at its annual meeting held on February 14, 1912, and had read its vote and resolution, the syndicate managers "Voted, that the issue by the Butte Central Copper Company of $150,000, of income bonds, to provide funds for installing a suitable mill for the treatment of ores at the Ophir Mine, as set forth in the said resolution read to this meeting be and is hereby approved and recommended, such action being in accordance with and necessary for the carrying out of the purposes of the syndicate agreement."

"The secretary then stated that, in their endeavors to negotiate a sale of the said income bonds of the Butte Central Copper Company, the officers of that company had reported that, owing to the nature of the security behind the bonds, it would be impossible to sell the same at 80 per cent of their face value, the minimum price fixed thereon as necessary to provide the required amount, unless there was included in such sale 20,500 shares of stock of the said company to be delivered *pro rata* with said bonds, and also that a provision be made for placing the remainder of said stock owned by the syndicate in trust for a period of three years, or until such time as the said income bonds shall be redeemed by the said company; and that the president of the company had asked the syndicate to provide the said stock

and to place the remainder of said stock in trust as above stated."

Following this statement it was "Voted, that in order to carry out the purposes of the Syndicate Agreement of providing additional working capital for continuing and developing the business of the Butte Central Copper Company, 20,500 shares of the stock of said company owned by the Syndicate be forthwith transferred and delivered to the treasurer of the said Company to be sold in connection with the $150,000 income bonds issued by the Butte Central Copper Company, and that the remaining 109,500 shares of said stock owned by the Syndicate be placed in trust under an agreement whereby the same shall be voted as directed by the Syndicate Managers for a period of three years from the fifteenth day of March, 1912, or until such time within said period as the said income bonds shall be paid and redeemed by the said Company; and also, Further Voted, that the Executive Committee of the Syndicate be and is hereby authorized and directed to have prepared a trust agreement that will meet the above stated requirements and submit the same for approval at the next meeting of the Syndicate Managers."

The plaintiffs, in support of their exceptions nine, eleven, twelve, twenty, twenty-eight and nineteen, twenty-one, twenty-two, twenty-three, twenty-four and thirty-nine vigorously and earnestly contend that the last vote was illegal, in that proper notice was not given of the proposed action and that the vote and all action thereunder was "without consideration to the syndicate, and solely for the purpose of enabling the copper company to sell its issue of bonds," and was in direct and palpable violation of [10] of the agreement which reads: "Unless the object of the syndicate shall be sooner attained as determined by the syndicate managers in their discretion, the syndicate shall remain in force for a period of three years from the date hereof."

We are of the opinion that the notice of March 2, 1912, was sufficient in view of the vote of December 2, 1911, to apprise the individual managers of the purpose of the meeting called for March 9, 1912. Should that meeting vote to procure additional funds required to install the proposed mill at the mine, it was then within the power of the board of managers to determine and provide ways and means to effectuate that result.

In determining whether the vote of March 9, 1912, was in furtherance of the business of the syndicate, we have first of all to take into account the undisputed fact, that the object of acquiring at least a majority of the stock of the Butte Central Copper Company was to enable the syndicate board of managers, through the voting power of the copper company stock, to determine, direct and control the management and policy of the business of the copper company. This is made certain, if evidence were needed, by the vote of the managers wherein they recommended to the copper company the installation of the concentrating mill at the Ophir mine, and the action thereon of the copper company at its annual meeting.

It appears by the master's report, that in December, 1911, and up to and including March 9, 1912, the copper "company had no money in its treasury, and there was little or no money in the treasury of the syndicate." The business of the company was not successful and it was imperative that money be raised by some means to carry on the work of development if the shares of the company were not to become very much reduced in value, or of no value. Confronted by this situation, and by the fact that the bonds would not sell at a price to produce $150,000 unless there was included in such sale a bonus of shares of stock of the company and an agreement to place the remainder of stock in a voting trust for a period of three years, the syndicate board of managers passed the second vote of March 9, 1912. Thereafter bonds were issued by the company and fifteen thousand twenty-nine shares of stock were delivered upon the order of the managers to the purchaser of the bonds.

At the time of the delivery of the above named shares of stock, all the shares of stock of the syndicate were in the possession of the First National Bank of Boston on deposit, and thereafter the remaining shares of stock were so retained in its custody to the day of the filing of the bill in this suit.

We are of the opinion that the raising of money, to maintain the value of the shares of stock of the syndicate through the development of the property of the copper company, was business of the syndicate within the terms of the agreement, and that the action of the board of managers in the determination of the ways and means of so doing was not, so far as appears by any evidence

in the record, taken in bad faith, in wilful negligence, outside the plan and scope of the agreement or in abuse of "their sole and absolute discretion."

The plaintiffs emphatically contend that they were entitled to receive "the possession, enjoyment and complete right of disposition of copper company stock in October, 1912, with its attendant benefits," and that therefore the agreement that placed the syndicate stock in a voting trust for a period of three years after the termination of the syndicate was outside the plan of the agreement, illegal and void.

The argument is founded upon a misconception of the terms of that agreement, which nowhere provides for a distribution *pro rata* in specie of stock, but does provide that "the affairs of the Syndicate shall be wound up by the Syndicate Managers and the net proceeds in cash or securities, including all dividends and interest received, shall be distributed *pro rata* among the Subscribers not in default."

It appears as a fact, that the managers, upon careful consideration, determined that the placing of the stock in trust was necessary to the protection of the syndicate interest in the copper company, and we cannot say that their judgment was wrong, illadvised, exercised in bad faith or in wilful negligence. There was no evidence that any demand ever was made upon the syndicate managers for an accounting or that they ever refused to make an accounting, and the master further finds "that a reasonable time for winding up the affairs of the syndicate, after the time when it terminated by the terms of the agreement, was one month after October 20, 1912." As this suit was brought before the expiration of a reasonable time for the winding up of the affairs of the syndicate, it follows that the defendants were not then in default and that the law upon the facts raised no obligation to account. See 2 Harvard Law Review, 241 *et seq.*

It is not necessary to discuss the obligations of the depository and of the transfer agent had the board of syndicate managers acted illegally or in bad faith. See *Dreyfus* v. *Old Colony Trust Co.* 218 Mass. 546.

We have carefully considered all the exceptions and find no reversible error. A decree must be entered (1) overruling the exceptions and confirming the master's report; (2) perpetually

enjoining the defendants from transferring to Samuel McConnell and Fred McConnell twenty-five hundred shares of the Butte Central Copper Company as voted by the syndicate managers June 14, 1910; (3) perpetually enjoining the defendants from transferring to Robert L. Clinton five thousand shares of the Butte Central Copper Company as voted by the syndicate managers June 14, 1910; (4) dismissing the cross bills.

*Decree accordingly.*