HULINGS C. BROWN *vs.* LITTLE, BROWN AND COMPANY
(INC.) & others.

Suffolk.    January 10, 1929. — October 30, 1929.

Present: RUGG, C.J., CARROLL, WAIT, & SANDERSON, JJ.

*Equity Pleading and Practice,* Master: findings, report, motion to re-
commit. *Corporation,* By-laws, Transfer of stock, Officers and agents,
Stockholder. *Equity Jurisdiction,* Laches, Estoppel, Fraud. *Fraud.*
*Words,* "Retire."

A report by a master in a suit in equity contained a succinct and clear
narration of the relations of the parties, of the circumstances of the
controversy in suit and of all facts deemed by him relevant to the issues
raised. The plaintiff filed many requests for findings of fact, and many
objections to the master's report. The master dealt with these in part
by saying that the plaintiff thought that the report in all its major
conclusions was wrong and therefore set out "to get into the record,
in one form or another, every bit of testimony and every stray fact
which, standing alone and without explanation, may tend to show that
the master's conclusions are inconsistent and erroneous. In pursuit
of this plan the plaintiff has made some fifty specific requests for find-
ings. These have been considered by me with great care. I have
allowed all of them which I believe are true and which are not incon-
sistent with my deliberate conclusions based upon all the facts. I
have refused to find those facts which I believe tell only a part of the
story or which might tend to create a doubt in the mind of a court
which has had no opportunity to hear all the evidence and to gauge
the character of the witnesses by actual observation." *Held,* that such
treatment of all the requests for findings of fact was adequate.

A master to whom was referred a suit in equity is not required to state
every subsidiary circumstance supporting his ultimate conclusion as
to the facts, nor to summarize evidence not given credence by him, nor
to narrate matters having no probative force in his final determination.

A motion to recommit a report to a master is directed to the discretion
of the judge who hears it and its denial will not be reversed when it
does not appear that such discretion was not wisely exercised.

Statement by RUGG, C.J., of the duties of a master in weighing evidence
and finding facts.

Exceptions to a report of a master in a suit in equity, based for the most
part upon fragments of testimony and isolated facts which, standing
alone, might possibly be thought to be a basis for a claim that the
findings were inconsistent or repugnant one to another, properly were
overruled where there was nothing in the report to indicate that the
master had failed in any particular in the performance of his duties or
to cast discredit upon the facts found by him.

There is no insuperable obstacle to giving effect to written instruments
according to their substance, however named.

By the agreement and articles of organization of a Massachusetts corpora-
tion, holders of common stock had the sole voting power and there was
no restriction on the transfer of stock.  Soon after the organization,
there was adopted at a special meeting of stockholders what purported
to be an amendment to the by-laws placing restrictions upon the
transfer of common stock which included among others a provision
that a holder of shares of common stock "who shall retire from employ-
ment by the corporation" should within sixty days of such retirement
transfer and deliver his shares to the directors at a valuation then to
be determined, to be disposed of by them in their discretion for the
safety and advantage of the corporation.  A copy of such amendment
was filed with the Secretary of the Commonwealth, was indorsed by
him as an amendment under St. 1903, c. 437, §§ 40, 41, and was re-
corded.  *Held*, that, however such amendment was entitled, the purpose
of all connected with the transaction was to amend the agreement of
association and articles of organization in respect to restrictions upon
transfer of capital stock.
This court, while stating that restrictions on the sale of shares of stock in a
corporation are valid and binding in this Commonwealth unless pal-
pably unreasonable, was not required in the circumstances to pass upon
the validity of the restrictions above described.
A master, to whom was referred a suit in equity in which the plaintiff con-
tended that the restriction above described was not valid, stated that
there was nothing in it "which is inequitable, unreasonable or con-
trary to public policy.  There is involved no possible question of preju-
dice to creditors or public."  Upon an exception by the plaintiff to
such statement, it was *held*, that the statement was interpreted as a
finding of fact which, however, was immaterial because this court also
decided that, properly interpreted, the amendment did not include the
plaintiff within its provisions in the circumstances.
For nearly fourteen years after the adoption of the amendment above
described, all officers and stockholders of the corporation, includ-
ing a stockholder and director who also was treasurer, recognized and
enforced the amendment as valid.  The treasurer then, for cause
deemed sufficient to the directors and other holders of common stock,
was not reëlected as an officer, his employment by the corporation
was terminated by the directors and he ceased to be recognized as a
holder of common stock.  In a suit in equity by him to compel such
recognition, it was *held*, that
    (1) The plaintiff was not in a position to invoke the aid of a court of
equity to have the restriction contained in the amendment declared
void as to him;
    (2) The words of the amendment, "a holder of shares of common
stock who shall retire from employment by the corporation," did not
refer to one whose retirement was involuntary, and therefore did not
refer to the plaintiff;
    (3) The plaintiff was entitled to a decree requiring that he be recog-
nized as a holder of common stock although he had been dismissed
from the service of the corporation.
In the suit above described, the plaintiff also averred that the defendant

officers of the corporation had treated him fraudulently in refusing to give to him privileges which were his as a holder of common stock, but the master, as to each charge of fraud or misconduct on the part of the individual defendants, singly or collectively, made findings that were categorically and unequivocally to the effect that it was entirely unfounded in fact and that such defendants had acted solely in the interests and for the welfare of the corporation and not with any intent to injure the plaintiff. *Held*, that the conclusion of the master that no fraud has been practised on the plaintiff or on the corporation must stand.

BILL IN EQUITY, filed in the Supreme Judicial Court for the county of Suffolk on June 6, 1927, and described in the opinion.

The suit was referred to a master. It appeared that the sole voting power in the defendant corporation was vested in the holders of its common stock. Other material facts found by him and portions of his report, motions heard by, and decrees entered by order of, *Crosby*, J., are stated and described in the opinion. The plaintiff appealed from the decrees.

*R. E. Goodwin*, (*R. R. Duncan* with him,) for the plaintiff.

*J. P. Carr*, (*P. F. Drew* with him,) for the defendants.

RUGG, C.J. This is a suit in equity by a minority holder of common and preferred stock in the defendant corporation against that corporation and its five directors. The main grounds of complaint by the plaintiff are that he is being unjustly and fraudulently deprived of all the privileges of a holder of common stock, and that the individual defendants have dealt improperly and fraudulently with certain shares of stock in the corporation acquired by it from the estate of a deceased stockholder in deprivation of personal rights of the plaintiff and in derogation of the rights of the corporation.

The case was sent to a master under the usual order to hear the parties and their evidence and to find and report the facts. Therefore no evidence is reported. Interlocutory decrees were entered denying the plaintiff's motion to recommit the master's report and overruling the plaintiff's objections to, and confirming, the master's report, and a final decree was entered dismissing the bill. Appeals by

the plaintiff from these decrees bring the case here.  The report of the master contains a succinct and clear narration of the relations of the parties, of the circumstances of the present controversy and of all facts deemed by him relevant to the issues raised.  The plaintiff filed many requests for findings of fact, and many objections to the master's report.  The master dealt with these in part by saying that the plaintiff thinks that the report in all its major conclusions is wrong and therefore set out "to get into the record, in one form or another, every bit of testimony and every stray fact which, standing alone and without explanation, may tend to show that the master's conclusions are inconsistent and erroneous.  In pursuit of this plan the plaintiff has made some fifty specific requests for findings.  These have been considered by me with great care.  I have allowed all of them which I believe are true and which are not inconsistent with my deliberate conclusions based upon all the facts.  I have refused to find those facts which I believe tell only a part of the story or which might tend to create a doubt in the mind of a court which has had no opportunity to hear all the evidence and to gauge the character of the witnesses by actual observation."  This was adequate treatment of all requests for findings of fact.  *Warfield* v. *Adams*, 215 Mass. 506, 520.  The denial of the plaintiff's motion to recommit the master's report to make further specific findings of fact presents no error of law.  A master is not required to state every subsidiary circumstance supporting his ultimate conclusion as to the facts, nor to summarize evidence not given credence by him, nor to narrate matters having no probative force in his final determination.  The motion to recommit was addressed to the discretion of the single justice.  We see no reason for doubting that this discretion was wisely exercised.  *Smith* v. *Lloyd*, 224 Mass. 173.  *Summerfield Co. of Boston* v. *Prime Furniture Co.* 242 Mass. 149, 154.  *Kilkus* v. *Shakman*, 254 Mass. 274, 278.  *Ledoux* v. *Lariviere*, 261 Mass. 242, 244.  The evidence not being reported, the facts found by the master must be accepted as true.  *Glover* v. *Waltham Laundry Co.* 235 Mass. 330, 334.  *Tripp* v. *National Shaw-*

*mut Bank,* 263 Mass. 505, 511. *Saulnier* v. *Benfield,* 265 Mass. 262.

The objections of the plaintiff to the master's report for the most part are based upon fragments of testimony and isolated facts which, standing alone, might possibly be thought to be basis for a claim that the findings were inconsistent or repugnant one to another. It was the duty of the master to weigh all the evidence and to reach a definite conclusion as his mind was led by the credible parts of it, and then to place the salient facts as found by him in their true perspective, so as to present in his report in sufficient detail a fair statement of his determination respecting the essential issues involved and thus to make a lucid and intelligible final announcement of the decision required by the exercise of his judicial faculties. The value of the testimony was a matter to be settled by the master upon his observation of the witnesses. He might have regarded some as dependable and others as shifty, biased, or unreliable. He might accept or reject in whole or in part the testimony of any witness. *Klayman* v. *Silberstein,* 252 Mass. 275, 278. *Commonwealth* v. *Russ,* 232 Mass. 58, 70. There is nothing in the master's report to indicate that he failed in any particular in the performance of his duties or to cast discredit upon the facts found by him.

The facts are that the plaintiff with others constituting the firm of Little, Brown and Company in 1913 organized the defendant corporation for the purpose of continuing the business of publishing and selling books. The partners transferred the assets of the business subject to its liabilities to the corporation and in payment took all its shares of capital stock both common and preferred. It was provided in the agreement of association that there were no restrictions on the transfer of stock. Soon after the organization of the corporation a special meeting of the stockholders was held at which there was presented what is designated an agreement to amend the by-laws, signed by all persons either then holding or entitled to hold common stock under the terms of the purchase of the partnership assets. Among the others this agreement was signed by the plaintiff and

one of the individual defendants.  The agreement provided that the by-laws of the corporation be amended by the addition of articles I and II, copies of which were annexed, and that the signers and their respective heirs, administrators and assigns should hold all their common stock subject to the provisions contained in the articles.  The proposed amendments were in these words: "Article I. A holder of Common Stock of the corporation, and the executor or administrator of such holder deceased, who by his will has devised his common stock to another common stockholder, may transfer any part or all of his shares to another holder of common stock of the corporation, and, with the consent in writing of the holder or holders of a majority of the shares of common stock held by others than the transferor being first obtained, may make such transfer to any other person, firm or corporation whomsoever.  The executor or administrator of the estate of a deceased holder of shares of common stock not so specifically devised, the grantee or assignee of shares of common stock taken on execution, and a holder of shares of common stock who shall retire from employment by the corporation, shall, within sixty days of the appointment of such executor or administrator, or of such taking or retirement, transfer and deliver their shares respectively of common stock to the directors for the use of the corporation, at a valuation as follows: If the transfer be made before the end of the third full fiscal year after incorporation, then at par.  If made thereafter, then for a sum equal to the total profits on said shares as shown by the Profit and Loss Account as determined by the Directors and entered on the books of the corporation for the three full fiscal years preceding the fiscal year in which such transfer be made, but not less than par.  And the corporation shall buy and pay therefor the amount of such valuation, payment to be made in twelve equal quarterly instalments within three years after such transfer. Shares of common stock shall give to the holder thereof no power to vote thereon, and no right to dividends declared thereon after such decease, taking or retirement, and until the same be disposed of to a new holder thereof; nor while

the same shall be owned by the corporation. Article II. The Directors shall have power, and it shall be their duty, to sell and dispose of the shares which may be transferred as aforesaid to the corporation at such price and for such consideration as they, in their discretion shall decide, whenever, in their judgment, it can be done with safety and advantage to the corporation, and in all sales made by the Directors under any of the aforesaid provisions, it shall be their duty to sell the shares to such persons as shall appear to them from their situation and character, most likely to promote confidence in the stability of the corporation. The issue of a certificate of stock by the proper officers of the corporation shall be conclusive evidence as against the corporation that the provisions of this By-Law have been complied with." These amendments were adopted unanimously at the meeting of the stockholders. Thereafter on the same day a certificate entitled "Articles of Amendment" on the usual form supplied by the commissioner of corporations was executed by the proper officers of the corporation stating that at a meeting of stockholders held on September 10, 1913, "the following amendment or alteration in By-Laws — as to rights of common stockholders of said corporation, was duly. adopted, namely." Then follows a copy of articles I and II as already set forth. This certificate was received by the commissioner of corporations and approved by him on September 11, 1913. On the back of this certificate was endorsed "ARTICLES OF AMENDMENT. (Acts of 1903, Chap. 437, Sects. 40, 41.) Amendment relative to Rights of Holders of Common Stock. Filed in the office of the Secretary of the Commonwealth, Sept. 11, 1913." "Recorded Vol. 289, p. 557." Thus this became a public record as much as were the original agreement of association and articles of organization. St. 1903, c. 437, §§ 11, 12. It is manifest that, however these amendments were entitled, the purpose of all connected with this transaction was to amend the agreement of association and articles of organization in respect to restrictions upon transfer of capital stock. The steps taken were such as were then required to that end. St. 1903, c. 437, §§ 40, 41. If intended

only as amendments to by-laws, nothing more was then required than the vote of stockholders, without filing, approval or record by any public official. As technical amendments to by-laws they were of no avail whatever because outside the scope of by-laws. There is no insuperable obstacle to giving effect to written instruments according to their substance, however named. *E. S. Parks Shellac Co.* v. *Jones*, 265 Mass. 108, 109, 110. All permanent certificates issued for common stock bear reference on their face to amendment I of the by-laws and each contains on its back a printed copy of said amendment. Each common stockholder has signed a receipt in which he agrees to hold his stock, and to transfer it only in accordance with amendment I of the by-laws of the corporation. The exact language of the receipt is as follows: "Received the above certificate, and in consideration of the delivery thereof to me, I agree that the same is held by me subject to, and may be transferred by me and my administrators and assigns only after full compliance with the By-Laws Amendment I of the Corporation." The plaintiff signed the agreement to amend the by-laws; he voted to amend at the stockholders' meeting of September 10, 1913; he signed the certificate of "Articles of Amendment" which was filed with and approved by the commissioner of corporations, and he signed receipts for both his temporary and permanent certificates of stock, acknowledging the amendment to the by-laws and agreeing to hold and transfer in accordance therewith. Every person who has become a stockholder in this company, from its organization to the present time, has taken his certificate with knowledge of the by-laws in question and has, in a written receipt, agreed to be bound thereby. For nearly fourteen years prior to the present controversy the plaintiff with other stockholders and directors has recognized and enforced these amendments as occasion arose, although no situation like the present has hitherto presented itself. Two instances have occurred where there has been compliance with these amendments by purchases by the corporation of shares of stock from the estates of deceased stockholders. Distribution of such

stock, in one of which the plaintiff shared, has been made with due regard to the interests of faithful employees and of the corporation. The plaintiff was for a time treasurer of the corporation, and a director from its organization until March 11, 1926.

Restrictions on the sale of shares of stock in a corporation are valid and binding in this Commonwealth. The absence of definite statutory limitations upon the power to impose such restrictions must be taken as a legislative determination that considerable latitude in this particular is permissible. No restrictions can be declared void unless palpably unreasonable. Unless prohibited, a corporation may purchase shares of its own stock. *New England Trust Co.* v. *Abbott*, 162 Mass. 148. *Barrett* v. *King*, 181 Mass. 476. *Silversmiths Co.* v. *Reed & Barton Corp.* 199 Mass. 371. *Adams* v. *Protective Union Co.* 210 Mass. 172. *Longyear* v. *Hardman*, 219 Mass. 405. *Fairfield Holding Corp.* v. *Souther*, 258 Mass. 540. *Fopiano* v. *Italian Catholic Cemetery Association*, 260 Mass. 99. *Albert E. Touchet, Inc.* v. *Touchet*, 264 Mass. 499.

Without passing upon the validity of the restrictions imposed by these amendments as abstract propositions, we are of opinion that, in view of all the circumstances here disclosed, the plaintiff is not in a position to invoke the aid of a court of equity to have them declared void as to him. It becomes unnecessary to discuss *Topken, Loring & Schwartz, Inc.* v. *Schwartz*, 249 N. Y. 206, and the principles on which it rests.

In this connection reference may be made to the exception to the part of the master's report to the effect that there is nothing in these amendments "which is inequitable, unreasonable or contrary to public policy. There is involved no possible question of prejudice to creditors or public." If this be treated as a ruling of law, it was beyond his power because not within the scope of the rule to the master. *New England Foundation Co.* v. *Reed*, 209 Mass. 556, 562. *Bradley* v. *Borden*, 223 Mass. 575, 586. It is interpreted, however, as a finding of fact with reference to its effect. Whatever may be its true significance, it has no

weight in view of the grounds on which this decision rests.

The plaintiff managed the retail department of the defendant corporation and also attended to the customs incident to importations. During the last few years of his connection with the company, he had allowed his work and his conduct during business hours to be appreciably affected by an indiscreet and excessive use of liquor. This weakness grew upon him until it was quite apparent that during 1924 and 1925 his conduct was exceedingly detrimental to the best interests of the business and highly distasteful to his associates. Without giving details the master found that the directors of the company had ample justification for the action which followed. On February 25, 1926, after an informal conference with the plaintiff, the other directors of the company voted that he be granted a leave of absence from March 1, 1926, to and including January 31, 1927, on half pay. The plaintiff accepted this decision and with the permission of his codirectors announced that his absence from business was caused by ill health. At the following annual meeting of the stockholders held on March 11, 1926, the plaintiff was not reëlected a director. This was within the power of the stockholders. *Opinion of Justices,* 261 Mass. 556, 597. In December, 1926, at an informal conference with the president of the company, the plaintiff was told that the directors had determined to make his retirement permanent. This was done. Under the by-laws unquestionably this was within their power. *Hayden* v. *Perfection Cooler Co.* 227 Mass. 589, 592. At this conference the plaintiff was asked to surrender his common stock in accordance with amended by-law I and it was suggested that, if he did so before January 31, 1927, the end of the fiscal year, the price which he would receive by the terms of the by-law would be considerably greater than that which he would receive by surrender after January 31, 1927. This was because earnings for the year ending in 1927 would be much less than those for the year ending 1924. Stock surrendered before January 31, 1927, would be priced according to the by-law at the aggregate net

earnings for the years 1924, 1925, 1926, or $324 per share; while stock surrendered after January 31, 1927, would be priced on the figures for 1925, 1926 and 1927. With the substitution of 1927 for 1924, a substantial reduction appeared certain. The complete figures show an actual reduction of $50 per share. The master found that the offer to accept the plaintiff's stock at the greater figure was made for no ulterior purpose, but was the kindly and generous act of men who were his friends. The plaintiff ultimately declined to accept this offer, said that he was in good health, and ready to go to work, and offered his services. The corporation made formal demand on the plaintiff to sell his stock to the corporation at the price ascertained according to the by-law. The plaintiff refused and denied the right of the corporation to compel the sale of his stock and thus his retirement from the corporation.

The main question on this branch of the case is whether the plaintiff has become "a holder of shares of common stock who shall retire from employment by the corporation" within the description of article I of the amendments. The significance of words of doubtful import or susceptible of different meanings may take color from the time and circumstances of their use and the presumed intention of the parties in connection with all attendant conditions. Every instrument in writing is to be interpreted in the light of all pertinent facts within the knowledge of those who signed it, and in such manner as to give effect to the main end designed to be accomplished. Words of a writing are to be construed according to the common and approved usage of the language and are not to be wrested from their usual sense to meet an exigency not foreseen when the instrument was drafted. *Eustace* v. *Dickey*, 240 Mass. 55, 72. *Moss* v. *Old Colony Trust Co.* 246 Mass. 139, 155. *Erickson* v. *Ames*, 264 Mass. 436, 441, 444. The natural impression conveyed by the words already quoted, in their context, is that the holder of common stock does not come within their scope unless he shall voluntarily withdraw from the employment. This interpretation is confirmed by closer analysis. The word "retire" may be used in either

a transitive or intransitive sense. This distinction is recognized in several sections of the statutes where it is used in both senses in contrast one to the other. G. L. c. 32, § 2 (4), (5); § 25 B, C (b); § 28, (4), (5); § 61. It occurs in its transitive sense in art. 58 of the Amendments to the Constitution. Manifestly it has the intransitive sense in the sentence here under consideration. When thus used it means voluntary withdrawal and not compulsory discharge. This is the consensus of opinion among lexicographers as to its signification. Often it carries the implication of recognition of honorable service. It is the antithesis of enforced resignation. It is not synonymous with "expel," "remove," "dismiss," or words of similar import. The words used cannot rightly be construed as if they read "retire or be retired from employment." This interpretation is supported by the principle of several decisions. In *Price* v. *Minot*, 107 Mass. 49, there was involved a contract of employment with provisions whereby an employee was ultimately to receive shares of stock as part of his compensation; it contained a provision that "if he should leave" the employment within certain dates a less number of shares should be due him. It was said at pages 60, 61, that this phrase could "only mean, if he should resign, or voluntarily quit or give up his employment. It is not the proper form of expression for the case of his expulsion or dismissal by the act of the company, without his consent, and against his remonstrance." In *Gardner* v. *Metropolitan Life Ins. Co.* 225 Mass. 439, there was presented for construction the words in a policy of insurance: "This policy shall become void whenever the insured named therein shall leave the service of the said Company except by cause of his death." In holding that a discharge from employment did not avoid the policy, it was said that these words "cannot be held to mean that the policy shall become void if for any reason the plaintiff ceases to be in the employ of the company; but that" properly construed they "signify that the policy shall become void if the plaintiff shall by his own act abandon his employment." In *Elwell* v. *State Mutual Life Assurance Co.* 230

Mass. 248, it was held that in a contract of employment the words "In case the said agent leaves the agency" and "should said Elwell sever his connection with this company" meant voluntary resignation.

If it had been the intention of the stockholders in adopting the amendment to provide for such a contingency as has arisen, and to require the transfer of his stock by a shareholder who rightly and for sufficient cause was discharged from the service of the corporation, or who ceased for any coercive reason to be in the employment of the corporation, it would have been easy to use words expressing that intention in unmistakable terms. The failure to do this and the selection of words of an opposite signification cannot be regarded as without weight. The circumstances that the highly prosperous condition of the corporation prior to the existence of the facts already stated had been brought about by a group of earnest, intelligent stockholders "working in perfect harmony and complete coördination for a single purpose," that "Faithful service has been rewarded and new executives have been picked from the ranks," and that the plaintiff's connection with the business has ceased for ample cause, cannot enlarge the meaning of the words of the amendment. They were chosen by the stockholders. By their meaning the rights of the parties hereto must be governed. It may be that the intent of those adopting the amendment was to provide that only those actively connected with the conduct of its business should be holders of common stock in the corporation. But the words of the amendment do not express that idea. We can only interpret those words; we cannot supply omissions. *Arruda* v. *Director General of Railroads*, 251 Mass. 255, 263. It follows that article I of the amendment has not become operative to require the plaintiff to transfer his stock to the corporation because he had not come within its description as "a holder of shares of common stock who shall retire from employment by the corporation." No exception to the master's report seems to be directed to this point, but it is open on appeal from the final decree.

Earnest argument has been made in behalf of the plaintiff that the individual defendants have been guilty of fraudulent conduct toward him and toward the corporation. That argument rests for its foundation on these facts: In December, 1926, Charles W. Allen, who at the time of the incorporation was the senior partner and who since incorporation had been the president of the defendant corporation, died. He left a will and codicil which provided in effect that the defendant McIntyre should have the right to purchase from the testator's estate three hundred shares of the decedent's common stock at a price determined under the by-law amendment No. 1, the stock to be paid for in twelve quarterly annual instalments and the unpaid instalments of the purchase price to bear interest at a reasonable rate of interest not exceeding six per cent per annum. The defendant McIntyre declined to purchase any of the shares owned by the decedent Allen and so notified the executor of his will. On January 24, 1927, the directors of the corporation, who are the personal defendants in this action, including Warren H. Wright, since deceased, voted that the corporation purchase all of the common stock owned by the Allen estate, amounting to five hundred shares, at a price determined by the provisions of the amendment, article I. The price paid was $324.61 per share. On the same day the directors voted to sell all of the shares thus acquired at $250 per share, three hundred and twenty shares being sold to themselves and the remaining one hundred and eighty shares to thirteen employees and others in the corporate organization, ten of whom had not theretofore been holders of common stock, without offering any of these shares to the plaintiff. The loss suffered by the corporation resulting from the purchase of the Allen stock by the corporation at $324.61 per share and the resale thereof at $250 per share amounted to $37,305, and this loss was charged against surplus before the closing of the corporate books on January 31, 1927.

With respect to these transactions the master's findings were: "I find that the Allen stock was sold at the by-law price without question by the representatives of the Allen

estate who had full information respecting the prosperity of the company and the book value of its shares. . . . 'I find that the selection of persons to share in the distribution of the Allen stock, and the allotment to each, were made fairly and in compliance with the well established policy of the company originally stated in Amended By-Law II and consistently followed ever since. No stock was offered to Brown [the plaintiff] because his services to the company did not warrant a reward. I find that the resale of the Allen stock at less than the purchase price was also in accord with a well established custom. The resale of stock thus acquired is by way of bonus or reward for faithful service. A considerable portion goes to minor employees who may be men of limited means. The price is fixed arbitrarily and in all instances since the death of Minard has been fixed at a figure substantially less than the purchase price. This is intended to preclude the possibility of loss to the recipient in the event of his death or retirement at a time when the by-law price may be temporarily depressed by poor earnings. There is no significance in this circumstance."

The plaintiff alleges that three of the defendants planned to defraud him and enrich themselves by forcing him to sell his stock to the corporation at the price ascertained by amendment article I and then to buy it themselves. He also avers that the defendants, in pursuance of the plan to defraud him, intentionally depressed the by-law price of his stock by increasing their own salaries, and by certain bookkeeping and accounting manipulations; and have withheld from distribution to stockholders an unwarranted portion of earnings which they have carried to surplus for future division among themselves. With respect to these charges the master said: "I find that the salary increases were reasonable and proper. The changes made in the company accounts were in accord with the best accounting practice, and that the accumulation of surplus was the part of sound business judgment. Neither salary increases, accounting changes, or additions to surplus, were made with any thought to defraud Brown or to enrich the defendants." As to every charge of fraud or misconduct on the

part of the individual defendants, singly or collectively, the findings of the master are categorically and unequivocally to the effect that it is entirely unfounded in fact and that these defendants have acted solely in the interests and for the welfare of the corporation and not with any intent to injure the plaintiff.

Fraudulent conduct commonly cannot be inferred. It must be found to exist. The general assumption of the law is in favor of honesty. Everybody is presumed to intend the natural consequences of his actions, and not infrequently this principle requires the inference of a fraudulent purpose from particular conduct in the absence of moral turpitude, and even when accompanied by an innocent and honest intention to accomplish a good object. *Matthews* v. *Thompson*, 186 Mass. 14, 21–23. *Smith* v. *Clark*, 242 Mass. 1, 7. *Illinois Watch Case Co.* v. *Cowan-Myers Co.* 250 Mass. 347, 350. Directors of business corporations often have been said to be trustees. Certainly they occupy a fiduciary relation. They must place their management of corporate affairs above their purely personal concerns. They are bound to act with reasonable intelligence although they cannot be held responsible for mere errors of judgment or want of prudence. *Albert E. Touchet, Inc.* v. *Touchet*, 264 Mass. 499, and cases there collected. *Manning* v. *Campbell*, 264 Mass. 386, 390. Generally the question of fraud is one of fact. It must be proved. It cannot be inferred from graphic denunciation or opprobious epithets. *Barron* v. *International Trust Co.* 184 Mass. 440, 443. *Phinney* v. *Friedman*, 224 Mass. 531, 533. There is nothing in the facts reported by the master which shakes the binding force of his general finding that no duty owed to the plaintiff by the individual defendants was violated by them.

It was the duty of the directors under article II of the amendments to sell the shares of stock acquired by the corporation "at such price and for such consideration" as they might decide for the advantage of the corporation, and to sell them "to such persons as shall appear to them from their situation and character, most likely to promote confidence in the stability of the corporation." It is not

necessary to review in detail the particular matters upon which the plaintiff relies. Specific facts dissociated from their setting in business affairs not infrequently have a sinister appearance, which is entirely obliterated by envisaging them in their proper relation to a whole course of conduct and series of events. It is enough to say that the conclusion of the master that no fraud has been practised on the plaintiff or on the corporation must stand. He saw and heard the witnesses and was better able to ascertain their motives and determine their credibility than any one else. *Adams* v. *Protective Union Co.* 210 Mass. 172, 176. *Simpkins* v. *Old Colony Trust Co.* 254 Mass. 576, 580. *Adamson* v. *Gilliland,* 242 U. S. 350, 353.

It is not necessary to examine in detail the exceptions to the master's report. For the reasons already stated, the interlocutory decrees are affirmed and the decree dismissing the bill must be reversed. A final decree is to be entered enjoining the defendants from denying to the plaintiff the full enjoyment of his rights as a holder of common stock in the defendant corporation, and for his costs.

*Ordered accordingly.*