W. HORACE LINTON & another *vs.* JOSEPH M. NOONAN & others.

Suffolk. October 19, 1920. — March 4, 1921.

Present: RUGG, C. J., BRALEY, DE COURCY, CROSBY, PIERCE, CARROLL, & JENNEY, JJ.

*Evidence,* Extrinsic affecting writing. *Contract,* Construction. *Equity Pleading and Practice,* Motion to recommit.

In a suit in equity between partners for the confirmation and enforcement of a contract of dissolution, or for a distribution and accounting, it appeared that the partners had been engaged in an enterprise of handling, purchasing and selling the by-products of cotton mills, both directly and on commissions, which, after three months of operation, had proved unprofitable, and that they then made a contract of dissolution, by which the plaintiff agreed "to buy out the interest of" the defendant, paying him all his investment and money he had lent to the partnership, less one half the losses sustained by the partnership, that all accounts receivable and payable and all future obligations were assumed by the plaintiff and "all contracts closed in the name of the" partnership "shall be assumed in their entirety by" the plaintiff. The contract further provided "with regard to commission mills" that the plaintiff would relinquish "all claims on all commission mills whose accounts" were then in the hands of the partnership, and that "all commissions earned on all stocks sold for the account of these mills to any and every source belongs to" the defendant, he paying the plaintiff $1,500 for relinquishing them. *Held,* that

(1) It was clear from the contract that the plaintiff, who was to continue the business, was to retain the "closed" contracts of the partnership, and that the defendant was to have the "commission" contracts;

(2) Parol evidence was admissible to explain the meaning of those trade terms.

It appeared at the hearing of the suit above described that a "closed" contract was for the purchase of the by-product outright, and that under "commission" contracts the partnership acted as the seller's agent, receiving a certain amount per bale of the by-product for a commission. Both classes of contracts were for whatever the mills might produce for the year, in some instances the quantities being estimated, but never guaranteed. The "closed" contracts were almost entirely with two groups of mills. The "commission" contracts were with some thirty-five mills. With some mills, the partnership had both closed and commission contracts, and in his answer the defendant claimed that in such cases he was entitled to both the closed and the commission contracts, and, in cross-examination of the plaintiff, made inquiry to sustain that contention. The defendant testified that, at conferences preceding the making of the contract, no mention was made of good will or of contracts with the two groups of mills with whom most of the "closed" contracts were made, and that they were not embraced in a statement and tabulation made in connection with the contract. The good will was of no value. Subject to objection by the defendant, the master admitted evidence tending to show that the amount of $1,500, which the contract between the plaintiff and the defendant provided that the defendant should pay to the plaintiff, was reached by an agreed calculation by the parties of several enumerated items which led to a computation of the value in the aggregate of the "commission" contracts, which the plaintiff relinquished to the defendant, in excess of that of the "closed" contracts, which the plaintiff was to retain. *Held*, that the evidence properly was admitted.

The contract above described also provided that the defendant was "not liable for any other claims of the" partnership "arising after the date of the closing of the books," and that he was not to be "able to make any additional claims on" the plaintiff or the partnership, and that "All accounts receivable and payable and all future obligations are assumed by" the plaintiff. The books were closed the next day after the contract was made and the plaintiff thereafter sent to the defendant a check for the amount of the defendant's investments and loans to the business, less his withdrawals and one half of the losses of the partnership, accompanied with a letter stating that the payment was "in full accord, satisfaction, and discharge of all liabilities under the dissolution agreement." The check was refused and returned. Before the books had been closed, the plaintiff had directed the bookkeeper to enter a number of items, which afterwards it was found had been omitted through his inadvertence and without knowledge of the parties. The plaintiff afterwards paid these items, some of them before sending the settlement check to the defendant. Some of them were for current expenses, payable monthly, such as rent, telegraph, telephone and electric power bills; some were for supplies recently bought and for which no bills had yet been received; the others were mere errors of the bookkeeper in failing to enter credits due to customers, and disputed items which resulted in liabilities. *Held*, that, from a construction of the contract as well as the conduct of the plaintiff, the plaintiff should not be allowed credit in the accounting for such omitted items.

Under the provisions of the contract above described, the defendant had no right to any share in the "closed" contracts.

The defendant in the suit above described had no right in the accounting to a credit as to a share in the good will of the partnership, since it was of no value.

At the hearing of the suit above described, evidence was not admissible tending

to show what commissions actually were collected on the "commission" contracts after the contract of dissolution was made.

A motion to recommit a master's report in a suit in equity so that the master might hear and report the evidence offered by the defendant and excluded by him against the defendant's objection and subject to his exception, and so that he might report the evidence admitted by him against the defendant's objection and subject to his exception, properly may be denied, where it appears that an original and supplemental report by the master adequately reported the evidence necessary for the consideration of all questions of law raised by the defendant's exceptions.

It is not the province of a master in a suit in equity to make rulings of law other than those incident to the conduct of the hearing before him.

A motion to recommit a master's report to "report the rulings of law requested by the defendant, his rulings thereon, and so much of the evidence as will be necessary for the intelligent consideration of his refusal to make the rulings requested;" and to "report the defendant's requests for findings of fact, his rulings thereon, and so much of the evidence as bears on each finding requested by the defendant and refused by the master," properly may be denied.

BILL IN EQUITY, filed in the Superior Court on July 19, 1917, and afterwards amended, alleging that, by a contract in writing, which is set out below, the plaintiffs and the defendants agreed to dissolve a partnership enterprise which they had undertaken under the name "Southern Utilization Company," that the plaintiffs had offered full performance of the contract on their part, and that the defendants had repudiated the contract and had brought an action at law against the plaintiffs. The prayers of the bill were for a confirmation of the agreement, or for a dissolution of the partnership, for a fixing of the amounts which either party should pay to the other and for the enjoining of the action at law.

The agreement, exclusive of the signatures of the parties, was as follows:

"Southern Utilization Co.
Cotton Mill Waste, Charlotte, N. C.

"We, the undersigned, agreed to the following proposition with regard to the dissolution of the partnership between us known as the 'Southern Utilization Company.'

"Josiah Linton & Company agree to buy out the interest of Noonan, Lyons & Company in the following manner:

"They propose to give Noonan, Lyons & Company one hundred cents on the dollar for their five thousand dollars invested in the Southern Utilization Company, plus one half the profit or

less one half the loss at the closing of the books January twenty fourth or twenty fifth, nineteen seventeen. Also agree to pay one hundred cents on the dollar for all moneys loaned by Noonan, Lyons and Company to the Southern Utilization Company over and above the amount invested plus six per cent interest, it being understood that no interest shall be paid on the original five thousand dollars invested. Inventory to be taken by Austin J. Thompson representing Noonan, Lyons and Company and John T. Miller representing Josiah Linton and Company on the after-noon of today, January twenty third. Prices to be placed on inventory by Joseph M. Noonan representing Noonan, Lyons and Company and William G. Beck Jr., representing Josiah Linton and Company on January twenty fourth. It being understood that Noonan, Lyons and Company are not liable for any other claims of the Southern Utilization Company arising after the date of the closing of the books, nor on the other hand are they able to make any additional claims on Josiah Linton and Company or the Southern Utilization Company. All accounts receivable and payable and all future obligations are assumed by Josiah Linton and Company. It is further understood that all contracts closed in the name of the Southern Utilization Company shall be assumed in their entirety by Josiah Linton and Company.

"With regard to Commission Mills. Josiah Linton and Company agree to relinquish every and all claims on all commission mills whose accounts are now in the hands of the Southern Utilization Company, dating from January twenty first to December thirty first, nineteen seventeen inclusive. All commissions earned on all stocks sold for the account of tnese mills to any and every source belongs to Noonan, Lyons and Company and Noonan, Lyons and Company in turn for Josiah Linton and Company having turned over to them all of these commissions and accounts, agree to pay Josiah Linton and Company the sum of fifteen hundred dollars ($1500.00) payable in thirty days from the closing of the books January twenty fourth or twenty fifth. It is further understood that if any of these commission mills do not agree to place the selling of their merchandise in the hands of Noonan, Lyons and Company and prefer to leave same in the hands of the Southern Utilization Company, that the Southern Utilization Company owned by Josiah Linton and Company will protect

Noonan, Lyons and Company and give them all commissions on all stocks sold for such mills.

"It is understood that all moneys owing to Noonan, Lyons and Company, both their investment and moneys loaned, will be paid to Noonan, Lyons and Company by the Southern Utilization Company in fifteen days from the date of the closing of the books, January twenty fourth or twenty fifth."

The suit was referred to a master, who filed a report and supplemental reports. Material findings and rulings of the master and exceptions by the defendants to the report are described in the opinion. The defendants moved to recommit the master's report on the following grounds:

"1. That the master hear and report the evidence offered by the defendants and excluded by him against their objection and subject to their exception;

"2. That the master report the evidence admitted by him against the defendants' objections and subject to their exceptions;

"3. That the master report the rulings of law requested by the defendants, his rulings thereon, and so much of the evidence as will be necessary for the intelligent consideration of his refusal to make the rulings requested;

"4. That the master report the defendants' requests for findings of fact, his rulings thereon, and so much of the evidence as bears on each finding requested by the defendants and refused by the master; and

"5. That the master report all the evidence bearing on each of his findings of fact objected to by the defendants as erroneous as matter of law, or as erroneous on all the evidence, or as inconsistent with his other findings."

The defendants also moved to set aside the master's report. The plaintiffs moved to confirm the report.

The suit was heard, upon the pleadings as amended, the reports of the master, the defendants' exceptions thereto, and the motions of both parties, by *Wait,* J., by whose order there were entered an interlocutory decree overruling the defendants' exceptions, denying the defendants' motions and confirming the master's reports, and a final decree confirming the contract between the parties, perpetually enjoining the action at law brought by the defendants against the plaintiffs, and stating the account between the parties

as it had been stated by the master, that is, charging the plaintiffs with $6,321.90, and crediting them with $5,342.84; and stating the balance due from the plaintiffs to the defendants as $979.06, "which sum the plaintiffs are to pay to the defendants; that all other sums and payments referred to in the said agreement, namely, all investments and loans made by the defendant co-partnership in and to said Southern Utilization Company, and the sum of" $1,500 "stated in said agreement to be paid by the defendants to the plaintiffs need not be paid, all of said payments having been taken into account and given proper credit or debit in the accounting."

The defendants appealed.

The case was argued at the bar in October, 1920, before *Rugg,* C. J., *De Courcy, Crosby, Carroll, & Jenney,* JJ., and afterwards was submitted on briefs to all the Justices.

*W. P. Murray,* (*A. Mehlinger* with him,) for the defendants.

*V. J. Loring,* (*G. H. Whittemore* with him,) for the plaintiffs.

De Courcy, J. The facts, as found by the master, are as follows: Both parties were dealers in cotton waste, the plaintiffs in Philadelphia, and the defendants in Boston. On or about October 21, 1916, these two firms by an oral agreement formed a partnership to handle, purchase and sell the by-products of Southern cotton mills, both directly and on commission, under the firm name of the Southern Utilization Company. They were to furnish an equal amount of capital, and share profits and losses equally. In pursuance of their primary object, they acquired a plant at Charlotte, North Carolina, and equipped it to "machine" the waste, making it more merchantable, and, by removing the dirt, effecting a considerable saving in freight charges. The business proved unprofitable, and, after several conferences, on January 23, 1917, the parties executed the dissolution agreement in controversy.

The utilization company then had in hand two classes of contracts with the mills, covering the year 1917. Those for the purchase of the waste outright, known in the trade as "closed contracts," embraced a group of twenty-seven mills designated the "Goodyear Mills," a group of seven called the "Erwin Mills," and a few others. The contracts to sell on commission were made with some thirty-five mills, each thereby constituting the utiliza-

tion company its agent to sell in its behalf certain grades of its waste throughout the year 1917 on a commission of $1.50 a bale, as a rule. Both "closed" and "commission" contracts usually were for whatever the mills might produce during the year, in some instances the quantities being estimated, but never guaranteed.

By the terms of the agreement the plaintiffs were to buy out the interest of the defendants in the utilization company, paying them their investment therein of $5,000 less one half the loss. An inventory was taken of the stock and fixtures, and prices placed thereon by representatives of the parties. A trial balance made from the books showed losses of the business to be $3,571.63; money drawn out by the defendants $284.18; and that the company owed the defendants for merchandise $659.10. On February 9, 1917, the plaintiffs sent to the defendants a statement, with their check for $3,589.11 in satisfaction of their liability under said agreement.

Meanwhile differences arose between the parties. On January 29, 1917, the defendants demanded a modification of the agreement, claiming a half interest in the contracts with the Goodyear Mills and the Erwin Mills. After some correspondence the defendants returned the above check to the plaintiffs, and they never have paid the $1,500 called for by the agreement. In May they brought an action at law against the plaintiffs, which is still pending. They seek therein to recover, in addition to the above $3,589.11, one half of the Goodyear and Erwin contracts and of the good will of the utilization company, aggregating $15,389.11, claiming that they are entitled thereto under said dissolution agreement, and that these amounts were erroneously omitted by the plaintiffs in their tabulation.

This bill in equity is brought to have said agreement confirmed, or for a dissolution and accounting. The plaintiffs seek also to recover for certain omitted items, and a further sum of $1,097.99 alleged to be due by reason of certain independent transactions between the parties; and an injunction to restrain the defendants from prosecuting said action at law. The defendants, on the other hand, seek to recover from the plaintiffs said $15,389.11, which they allege to be due them under the terms of the dissolution agreement, and the further sum of $1,322.69 due them by reason of certain independent transactions.

The master, to whom the case was referred, found the agreement in controversy to be of binding force and effect; and that the omitted items, with minor changes, should be considered as liabilities of the utilization company in arriving at the net loss resulting from its business, and hence at the amount payable to the defendants for their interest. He disallowed the claims of the defendants as to the amounts alleged to be due them under the agreement; determined the amounts due each in connection with their independent transactions; and found the balance due the defendants to be $979.06. In the Superior Court motions to recommit and to set aside the master's report were denied; the exceptions of the defendants to the report were overruled, the report was confirmed, and a decree was entered in accordance therewith. The unnecessarily large number of exceptions (two hundred and forty-three) taken by the defendants to the master's report will be considered under the few subjects to which they relate.

1. The main question raised by the exceptions relates to the admission of parol evidence. The master states in his supplemental report: "At an early stage in the proceedings the defendants objected generally to the introduction of any evidence as to what was said or done by the parties at the several conferences preceding and leading up to the draft and execution of agreement 'A.' * I overruled this objection, and all such evidence as was admitted was admitted subject to the defendants' exception." This brief statement in substance covers the same ground as some ninety exceptions, taken by the defendants to the admission of testimony, to the failure to strike out the answers, to the findings of the master as being based thereon, and to the refusal to give certain rulings and make certain findings of fact requested on the same subject. The evidence in question showed how the $1,500 payable by the defendants was arrived at by the parties. They estimated the present and prospective profits of both classes of contracts. The commission contracts, which went to the defendants, and which were made mostly by the defendant Noonan, were estimated as worth $18,000; or $15,000 after deducting $3,000 for unforeseen contingencies. The value of the "closed" contracts

---

* This is the contract above set out.

was reached by estimating those with the Goodyear Mills as worth $10,000, the Erwin Mills contracts at $3,600, and the remaining ones at $2,000. After deducting $3,600 for contingencies, this left $12,000 as the probable net profit coming to the plaintiffs from operating under these contracts for the year 1917. To place the parties on an equal footing they agreed after some dickering, that the defendants should pay $1,500 to the plaintiffs.

It is clear from the agreement itself that the plaintiffs, who were to continue the business, were to retain the "closed" contracts of the utilization company, and that the defendants were to have the "commission" contracts. Parol evidence was admissible at least to explain the meaning of these trade terms. Even then it was not plain from the writing what the parties meant with reference to commission contracts; and when the language " claims on all commission mills " etc. was applied to the subject matter. its ambiguity became apparent. It provided as follows: "With regard to Commission Mills. Josiah Linton and Company agree to relinquish every and all claims on all commission mills whose accounts are now in the hands of the Southern Utilization Company, dating from January twenty first to December thirty first, nineteen seventeen inclusive. All commissions earned on all stocks sold for the account of these mills to any and every source belongs to Noonan, Lyons and Company and Noonan, Lyons and Company in turn for Josiah Linton and Company having turned over to them all of these commissions and accounts, agree to pay Josiah Linton and Company the sum of fifteen hundred dollars ($1500.00) payable in thirty days from the closing of the books January twenty fourth or twenty fifth. It is further understood that if any of these commission mills do not agree to place the selling of their merchandise in the hands of Noonan, Lyons and Company and prefer to leave same in the hands of the Southern Utilization Company, that the Southern Utilization Company, owned by Josiah Linton and Company, will protect Noonan, Lyons and Company and give them all commissions on all stocks sold for such mills." It appears that with some mills the company had contracts to buy waste outright and also contracts to handle some of their waste on commission. The defendants, in their answer, claimed that in such cases they were entitled to both under the dissolution agreement. They requested the master to

rule that they were entitled to one half the value of the Goodyear Mills contract and the Erwin Mills contract, and of the good will of the utilization company, and requested him to find that these were not included in the tabulation of assets or trial balance. These contracts constituted the bulk of the closed contracts of the utilization company. It is also to be noted that a large portion of the testimony objected to was introduced in redirect examination of the plaintiff Linton, after counsel for defendants had opened up the matter in cross-examination. Further, the defendant Noonan testified that at the dissolution conference there was no mention of the good will or of the Goodyear or Erwin contracts which led to much of this testimony in rebuttal.

We have then, not an attempt to vary or contradict a written contract whose terms are plain; but a writing whose doubtful terms require explanation, and where the meaning which the parties put upon their words can be determined only by applying the language in the light of the subject matter to which the contract relates, and the circumstances in which it was made. The estimates of values which the parties placed on the commission contracts and the good will, at the dissolution conference, were admissible also to meet the issue raised by the defendants, — that these items were not embraced in the statement and tabulation made in connection with the agreement in controversy, — as well as on other grounds above indicated. *Whittier Machine Co.* v. *Graffam,* 156 Mass. 415. *Alvord* v. *Cook,* 174 Mass. 120. *Smith* v. *Vose & Sons Piano Co.* 194 Mass. 193, 200. *Jennings* v. *Puffer,* 203 Mass. 534. *Putnam-Hooker Co.* v. *Hewins,* 204 Mass. 426, 430. *Willett* v. *Smith,* 214 Mass. 494. *Whidden & Co. Inc.* v. *Jordan,* 215 Mass. 189. *Waldstein* v. *Dooskin,* 220 Mass. 232.

2. Some time after the plaintiffs took over the business of the Southern Utilization Company certain liabilities of that company came to light which did not appear on the books on January 24, 1917. Preparatory to closing the books on that date and making up the balance sheets, the plaintiff Linton directed the bookkeeper to enter a number of items that were found to have been omitted. The omission of the items in question, fifteen in number, was due to the inadvertence of the bookkeeper, and was without the knowledge of the parties. The question arises whether the plaintiffs who have paid these items should now be credited therewith

in the accounting, and the amount payable to the defendants for their interest in the company be proportionally reduced.

On this narrow issue the defendants filed eighty-seven or more exceptions. As to most of these we deem it enough to say that we find no reversible error in the admission of testimony, and that we cannot review the findings of fact in the absence of the evidence. The answer to the question depends upon the correct construction of the dissolution agreement read in the light of the circumstances in which it was made, and of the practical construction which the parties put upon it. They were equally familiar with the details of the business of the Southern Utilization Company, in which they were partners. While the dissolution agreement was somewhat informally drawn, it contemplated a final settlement of their interests and liabilities therein. An inventory was taken and the books were closed. The plaintiffs were to take over the business, and the defendants were to receive "one hundred cents on the dollar for their five thousand dollars invested in the Southern Utilization Company, plus one half the profit or less one half the loss at the closing of the books January twenty fourth or twenty fifth, nineteen seventeen." The agreement also provided that the defendants were not to be liable "for any other claims of the Southern Utilization Company arising after the date of the closing of the books, nor on the other hand are they able to make any additional claims on Josiah Linton and Company or the Southern Utilization Company. All accounts receivable and payable and all future obligations are assumed by Josiah Linton and Company."

Some of these items now in question were for current expenses, payable monthly, such as rent, telegraph, telephone and electric power bills; some were for supplies recently bought and for which no bills had yet been received; the others were mere errors of the bookkeeper in failing to enter credits due to customers, and disputed items which resulted in liabilities. Some, if not all, of these presumably were known to the parties when they were negotiating the terms of the settlement. The omission from the agreement of any express provision for these after-discovered bills payable is significant as indicating that the books as made up on January 24 were taken as the basis of settlement; the plaintiffs taking all accounts receivable and assuming those payable. This

view is confirmed by the subsequent acts of the plaintiffs them-
selves. They paid some of these bills before sending the settle-
ment check for $3,589.11 to the defendants February 9, 1917.
In the accompanying letter, which stated that the payment was
"in full accord, satisfaction, and discharge of all liabilities under
the dissolution agreement," there was no suggestion that the de-
fendants were liable for one half of the amount already paid by
the plaintiffs on "after-discovered" accounts, and no reference
to any that might later come to light. Indeed no such claim was
made until after the defendants had brought an action for alleged
breach of the agreement (May 1, 1917) and returned the check
for $3,589.11. In view of these facts a majority of the court are
of opinion that the master erred in allowing the payment of these
items to the amount of $2,656.19 as a credit to the plaintiffs in
the accounting; and that the exceptions directed to this finding
must be sustained.

3. There was no error in disallowing the claims of the defend-
ants for a share in the "closed" contracts, which passed to the
plaintiffs as their absolute property. The same is true as to the
good will, which, the parties agreed and the master finds, was of
no value.

4. The evidence as to the amount of commissions actually
collected after dissolution was rightly excluded. As the value of
the commission contracts was agreed upon at the execution of the
dissolution agreement, even evidence of their actual value would
have been immaterial.

5. The court's denial of the motion to recommit shows no
abuse of discretion. The original and supplemental reports of
the master adequately reported the evidence necessary for the
consideration of questions of law. It was not his province to
make rulings of law; and his disposition of the requests at the end
of his report, was all to which the defendants were entitled. The
practical result of granting items four and five in the motion would
be to substitute a trial of the master for a trial of the case.

6. What has been said disposes of the material questions raised
by the exceptions. While all of them have been considered, it
would serve no useful purpose to discuss the individual excep-
tions in greater detail. They were rightly overruled, with the
exception of those referring to the plaintiff's "omitted items"

dealt with in the foregoing paragraph numbered 2. The result is, that the account should be corrected by substituting $1,785.81 for $3,113.91 as one half the loss in business of the utilization company chargeable to the defendants, thereby making their indebtedness to the plaintiffs $4,014.74 instead of $5,342.84 as found by the master. The decree is to be modified accordingly, and by substituting $2,307.16 for $979.06 as the amount due from the plaintiffs to the defendants on the accounting. As so modified the decree is to be affirmed.

*Ordered accordingly.*