GEORGE H. TUTTLE, administrator, & others *vs.* WILLIAM H. COREY.

Middlesex.   March 6, 1923. — May 24, 1923.

Present: RUGG, C.J., BRALEY, DeCOURCY, CROSBY, & PIERCE, JJ.

*Equity Pleading and Practice,* Master: exceptions to report, rule, requests for findings. *Equity Jurisdiction,* To relieve from fraud. *Fraud. Undue Influence.*

Where a master who heard a suit in equity has not reported the evidence, his findings of fact are final unless on the face of the report they are erroneous or are inconsistent with each other.

No exception to the report of a master in a suit in equity will be sustained by reason of a refusal of the master to grant a request for a finding of fact or to state in his report a reason for not granting such a request.

While, under a rule referring a suit in equity to a master " to hear the parties and their witnesses, examine their vouchers and accounts and report the facts and such portions of the evidence as either party may request to the court," either party is entitled to a report of so much of the material evidence as was relevant to sustain his contention of fact or to refute the contentions of his opponent, he is not entitled to such a report upon a request made for the first time after the terms of the master's draft report have come to his knowledge.

Under the form of the rule to the master above described, it was not the master's province to make rulings of law other than those incident to the conduct of the hearing before him.

Upon detailed findings by a master to whom was referred a suit in equity to have certain conveyances, made by an elderly and infirm woman to the defendant, declared to have been procured by undue influence and fraud of the defendant, and for an accounting, it was *held* that a final decree granting the relief sought was warranted.

BILL IN EQUITY, filed in the Superior Court on December 19, 1919, to have certain conveyances of real and personal property by the plaintiff to the defendant adjudged to have been procured by fraud and undue influence, to have the

property reconveyed and the defendant required to account for rents and profits.

The suit was referred to a master by a rule described in the opinion. Pending the filing of his report, the plaintiff died and the administrator of her estate and her sole heirs at law were admitted as parties plaintiff. Material findings by the master in two reports, and exceptions by the defendant to the reports are described in the opinion.

The suit was heard by *Sanderson,* J., upon the master's reports, the defendant's exceptions thereto, and certain motions to recommit the report to the master. The judge ordered entered interlocutory decrees confirming the master's reports and denying the motion to recommit, and a final decree granting to the plaintiffs the relief sought. The defendant appealed.

*W. H. Corey,* pro se.

*S. D. Elmore,* for the plaintiffs.

PIERCE, J. This is a bill in equity brought by a conservator, in behalf of Ann Tuttle, against the defendant, William H. Corey, wherein it is alleged in substance that Frank W. Hoit was appointed and qualified conservator of the estate of Ann Tuttle on December 17, 1919, because of her advanced age and mental weakness. Since the completion of the hearings before the master, Ann Tuttle (the plaintiff) died on April 6, 1921. George H. Tuttle was appointed and duly qualified as administrator of the estate of Ann Tuttle; and he, as such administrator, together with himself personally and Willie Warren Tuttle, sons and heirs at law of Ann Tuttle, have been admitted as parties plaintiff to prosecute the action.

The bill alleges that the defendant through fraud and improper influence did on December 7, 1907, secure from Ann Tuttle conveyances of two parcels of land with the buildings thereon — one in South Acton and the other in Cambridge; that said defendant collected rents from the Cambridge property which he has not accounted for to said Ann Tuttle; that said defendant collected the income of a trust under which Ann Tuttle was the beneficiary, purporting to act under a written power of attorney from her,

which he procured through wrongful influence and fraud;
that Ann Tuttle had money and personal property which
she transferred to the defendant by reason of fraud and
undue influence practised by the defendant, who has in no
way accounted to her. The bill prays that the defendant
be required to account to Frank W. Hoit, conservator,
for all money or property received from Ann Tuttle; that
he be ordered to convey and pay over to the conservator all
properties and money belonging to Ann Tuttle which were
improperly procured by him. The answer asserts ignorance
of, or denies, all material allegations. The cause was re-
ferred to Thomas A. Wiles, as master, " to hear the parties
and their witnesses, examine their vouchers and accounts
and report the facts and such portions of the evidence as
either party may request to the court."

The master duly made report without the evidence and,
so far as appears, without the request of either party to
report the evidence applicable to any issue raised during
the progress of the trial. The report of the master gives a
review of the lives of the plaintiff and the defendant in so
far as knowledge thereof tends to throw light upon the
conduct of the defendant and his influence upon the action
of the plaintiff after February 3, 1905. He finds that be-
tween 1894 and 1906 the defendant " succeeded in making
her believe that he was necessary to her and that his advice
was important;" and that from 1894 to January, 1906,
the influence of the defendant upon the plaintiff " continued
to increase and be more noticeable."

He finds that on February 3, 1905, the property owned by
Ann Tuttle as an individual consisted of a dwelling house
and land in Cambridge, valued at about $4,000, which rented
for from $35 to $40 a month; the house in which she lived at
South Acton (which produced no income) valued at about
$2,375; and some cash. In addition to this she was the
beneficiary under the trust created by her husband's will,
the principal of which amounted to about $12,000 and which
produced a yearly income to her of about $400; and also
if the income was not sufficient the will provided that the
principal might be used for her comfortable support.

On February 3, 1906, a contract dated February 3, 1905, was drawn between Ann Tuttle and the defendant Corey wherein, among other things, it appears that William H. Corey was to act as " general business manager and assistance in every thing pertaining to her welfare at said South Acton for a period of six years . . . for the sum of one thousand two hundred dollars per year . . . one hundred dollars per month . . . ; that the death of either of them occurring prior to the expiration of said term of six years would terminate this agreement." As regards this contract the master found upon all the evidence that " it appears as a fact that there was no need of a ' business manager' as called for by the said agreement, and that such work as she could require from the defendant Corey was in no way sufficient to entitle him to the payment of $1200 a year for his services;" and further found that her welfare did not require such services at the time and as called for under the agreement bearing date of February 3, 1905; that she did not have sufficient money from her income to pay much more than one half the salary required by the contract; that upon all the evidence, at the time of the making of the contract " Ann Tuttle was beginning to show signs of mental weakness and incapacity as indicated by her general conduct toward said Corey and toward her son, Dr. Tuttle, and was unduly subject to the influence and control of the defendant Corey; . . . that the defendant Corey created a place for himself in the life of Ann Tuttle; that he worked on her mind in its weakened state and caused her to believe he was her only friend; he caused her to have ill feelings toward her children, her grandchildren, her brothers and sisters; that he caused her to be suspicious of them and led her to believe that they were trying to impose upon her and get from her her property; " that " Mr. Corey visited or boarded with Ann Tuttle while she was at the old homestead for short periods amounting to about two weeks, and that afterwards when she returned to her home in South Acton in December, 1905, he went to live with her and that he has since continued to live with her for the entire time in said house and alone to the date of this hearing, except

for occasional periods when one grandchild in the early part of the defendant's residence lived there, and later when a young girl about fourteen years of age was brought there to assist about the house;" that this situation much disturbed her family and relatives and they remonstrated with her soon after Corey went to live with her, and told her that people were talking about the impropriety of her living in the house alone with an unmarried man; but she refused to change her position relative to William H. Corey.

It appears from the report that on December 10, 1907, the plaintiff conveyed to the defendant, by two warranty deeds, her real estate in suit in South Acton and Cambridge; the consideration being stated as $1 and other valuable considerations. It appears that the defendant claimed that under the contract dated February 3, 1905, he was entitled to receive for services rendered up to December 10, 1907, the sum of $3,400; that in addition to the $3,400, he held notes given by the plaintiff to him for money advanced amounting to $1,400; that he was under contract to complete the balance of the six years as her " business manager;" that there would be approximately $4,000 due him under said contract for the balance of the same; that the total amount claimed then due and later to become due was adequate consideration for said conveyances of real estate; and that in addition to these amounts he claimed he was entitled to compensation for making repairs on the property up to that time, for support and for other moneys given the plaintiff, the amount of which he was unable to state. As respects the consideration claimed to have been paid for these conveyances the master finds " that no adequate consideration was given for the conveyances of the two pieces of property; that at this time Ann Tuttle was in a state of mental weakness and incapacity, was unduly subject to the influence of the defendant Corey, which influence he wrongfully exerted upon her, and that the conveyances were secured by fraud."

On December 10, 1907, Ann Tuttle executed a bill of sale of all silver, pictures, jewelry, wearing apparel and household furniture of every description in the house in which she lived

at South Acton; and as a part of the bill of sale Corey agreed to permit her the use of every article stated therein during her natural life. The consideration stated was $1 and valuable considerations. " Upon all the evidence " the master finds " that on December 10, 1907, Ann Tuttle was in a state of mental weakness and incapacity, was unduly subject to the influence of the defendant Corey, which influence he wrongfully exerted upon her and that the conveyance was secured by fraud, and without adequate consideration."

The master further finds that after December 10, 1907, the date of the deeds and bill of sale, " Ann Tuttle had no property, real or personal, left, except the right to the income under the trust created by the will of her husband, and the right to the use of the principal;" that Ann Tuttle had not sufficient money to pay the defendant $100 per month; that no money was ever paid to him; and that one of the reasons of the defendant Corey for securing conveyances of real estate and personal property was to secure to himself the payment of his claim under said alleged contract of February 3, 1905, which contract was obtained by his fraud and undue influence.

More concisely stating the findings of the master as to the relations of Ann Tuttle and the defendant Corey, it appears therefrom that the defendant collected the rents of the Cambridge property up to December 10, 1907, that these moneys were put by Ann Tuttle into a " common purse," hidden in secret places about her house, and were used to defray the living expenses of Ann Tuttle and the defendant and to care for the property. After the conveyances on December 10, 1907, the defendant claimed that he was owner of the property and as such collected the rents up to December 17, 1919. These rents he claimed were paid to Ann Tuttle on account of the purchase price of the real estate but were in fact put into the " common purse " and were used for the living expenses of Ann Tuttle and the defendant. Between 1905 and 1916 Ann Tuttle received from her father's and from her brother's estate and from the payment of a mortgage sums amounting to $1,729.92.

These sums as received were put by her into the " common purse " and were used for the living expenses of Ann Tuttle and the defendant and also in the care of the real estate.

At the hearing before the master the defendant produced a power of attorney bearing date of June 16, 1905, which had been altered; and also a power of attorney dated July 24, 1912. The first of these instruments was a general power; the second specifically empowered the attorney to " collect any and all moneys . . . examine all the past and future accounts . . . of any trustees . . . or other persons acting in a fiduciary capacity . . . and approve . . . or to contest them." As to these powers the master finds that Ann Tuttle was in a state of mental weakness and incapacity at the time of giving them and that they were obtained in fraud. The defendant produced at the hearing certain promissory notes signed by Ann Tuttle, amounting to $1,400; these the master finds were procured through the undue influence and fraud of the defendant. The defendant claimed at the hearing before the master that at the expiration of the alleged contract of February 3, 1905, an oral contract was made, whereby, and by virtue of the powers of attorney, he provided board, lodging, care, protection and nursing; that he acted as attorney; that as a consequence he was damaged; and that as Ann Tuttle has no property, not only is she liable but the trustees of the estate of her husband are also liable. The master finds that no such oral contract was ever made for such services and acts as the defendant claims. On April 1, 1918, the defendant prepared and caused Ann Tuttle to sign a lease, whereby he leased to her the house at South Action formerly owned by her, at a rental of $300 per year, she to do all repairs and he reserving to his own use the back upper chamber. The master finds that Ann Tuttle at the time of signing the lease was in a state of mental weakness and incapacity, was unduly subject to the influence of the defendant and that she was improperly and in fraud induced to sign said lease. During the entire time, as the master finds, the defendant paid nothing into the " common purse " and he had his living provided for him from January, 1906, until the time of the hearing; that

the defendant knew the weakened mental condition of Ann Tuttle and of his ability to influence her; that he went to live with her for the purpose of getting for his own use all the property he possibly could and, so far as he could, prevent her children from getting any; that he kept her under his influence for the entire time; that he attempted to and did alienate her from her family and relatives for the purpose of holding and securing greater control over her; and that the mental condition of Ann Tuttle was such that she did not know or understand the consequence of her act.

Against these findings the master finds that during all the time from January, 1906, the defendant treated Ann Tuttle kindly; that he assisted her about the house, did all errands and chores, looked after her property, collected rents, made repairs, kept her company, went with her to many social occasions, and on three occasions took care of her when she was ill; that under all the conditions she was satisfied; that after a serious illness in October, 1918, he took care of her and did it faithfully and well.

The defendant took sixty-two objections to the master's report; and subsequently duly filed a like number of exceptions based upon the refusal of the master to find and rule as requested in the several objections. Of these exceptions forty-six are taken to findings of fact or to the refusal to make requested findings of fact. The evidence not being reported, the findings of fact are not reviewable unless shown by the report to be erroneous. *Greenhood* v. *Richardson*, 226 Mass. 208. *Poulette* v. *Chainay*, 236 Mass. 602. The master should receive requests for findings of fact but is not bound to make such findings or to make reasons for his refusal to state them, in his report. *Warfield* v. *Adams*, 215 Mass. 506, 517, 518. *Hannigan* v. *Old Colony Trust Co.* 227 Mass. 370, 372. *Davis* v. *Boston Elevated Railway*, 235 Mass. 482, 494. Five of the exceptions are founded upon the objection that the master does not recite the evidence or the facts from which his several conclusions of fact can be inferred. Under the rule issued to the master the defendant was entitled to a report of so much of the material evidence as was relevant to sustain his contention

of fact or to refute the contentions of his opponent, but he was not entitled to such report after the terms of the draft report had come to the knowledge of the parties. *Cook* v. *Scheffreen,* 215 Mass. 444, 448. The remaining requests are based upon the refusal or neglect of the master to make general rulings of law upon the facts set out in the draft report. Under the form of the rule to the master in the case at bar, it was not the master's province to make rulings of law other than those incident to the conduct of the hearing before him. *Bradley* v. *Borden,* 223 Mass. 575. *Cook* v. *Scheffreen, supra. Baush Machine Tool Co.* v. *Hill,* 231 Mass. 30, 40. *Linton* v. *Noonan,* 238 Mass. 31, 42. An examination of the report of the master upon the recommittal discloses no error in the order of recommittal or in the proceedings before him. The facts found by the master justify the final decree, which conforms to the frame and prayers of the bill. *Hanscom* v. *Malden & Melrose Gas Light Co.* 220 Mass. 1. It results that the interlocutory decrees and the final decrees must be affirmed.

*Decree accordingly.*