JACINTO MOSS & others *vs.* OLD COLONY TRUST COMPANY.

Suffolk.    January 10, 1923. — September 13, 1923.

Present: RUGG, C.J., BRALEY, DeCOURCY, CROSBY, & CARROLL, JJ.

*Practice, Civil,* Findings by judge, Exceptions. *Letter of Credit. Contract,* What constitutes, Construction, Performance and breach. *Estoppel. Waiver.*

An exception, saved to a refusal to grant a request for a general finding for the plaintiff at the hearing by a judge without a jury of an action at law where there was a finding for the defendant, presents to this court merely the question of law, whether the finding for the defendant can be supported by any reasonable interpretation of the evidence with legitimate inferences therefrom.

General and special findings by a judge hearing an action at law without a jury must stand if warranted in law upon any possible view of the evidence.

Upon exceptions, saved at the hearing of an action at law by a judge without a jury, it is not the function of this court to pass upon the weight of the evidence, even if it is reported in full.

At a hearing by a judge without a jury of an action of contract by a merchant in Buenos Aires against a Boston bank upon a letter of credit, the following facts appeared: The bank in Boston sent by cable to the merchant in Buenos Aires through the merchant's bank there a message that it had opened an " irrevocable credit " in a certain amount on the credit of a Boston corporation for sight drafts on the bank covering shipments of a certain amount of sugar " net shipping weights " at a stated price " per 10,000 kilos " and requiring to have attached to the draft a certificate of a chamber of commerce that the sugar was " equal to fine American Standard granulated sugar." The merchant, because the letter did not correspond with the provisions of his contract with the purchasing corporation, caused a reply cable to be sent, reading: " . . . state sold . . . [the price] per thousand kilos gross weight not per ten thousand kilos quality . . . [the merchant's] option not granulated only." In the meantime, the Boston bank had sent a second cable, reading, " . . . advise . . . [the merchant] certificate from chamber of commerce must mention without lumps," and the next day replied to the cable of the merchant's bank, " . . . price . . . per 1000 kilos. Our clients require sugar equal quality and description Standard American granulated sugar." The merchant made no reply to the second and third cables from the Boston bank. *Held*, that

(1) A finding, as an inference from what was said and done by the merchant, that he had not accepted the original cable from the defendant as conforming to his contract with the Boston corporation, but had rejected it, hoping to have it amended so that it would conform, was warranted;

(2) A further finding, that no contract was made between the plaintiff and the defendant, was warranted;

(3) The original cable offer by the defendant not having been accepted by the plaintiff, the defendant had a right to add the condition stated in its second cable, that the certificate of the chamber of commerce " must mention without lumps."

Assuming acceptance of the offer in the defendant's cable above described, the plaintiff drew on the defendant four drafts corresponding to shipments of sugar. The defendant refused payment of all the drafts, refusal as to the first being upon the stated ground that " these documents were not as specified in our Letter of Credit " and that the merchandise did not conform to contract; of the second and third because the letter of credit on which the drafts were drawn by the plaintiff specified sugar equal to fine American standard granulated sugar without lumps, and that certificate to that effect by the United States Chamber of Commerce of Buenos Aires must accompany the drafts; and of the fourth " on account of certificate of United States Chamber of Commerce of Buenos Aires not certifying that the sugar is equal to fine American Standard granulated sugar, without lumps as specified in Letter of Credit opened in favor of " the merchant. There was a general finding for the defendant. *Held*, that

(1) A finding, that there was no estoppel against the defendant which confined it to the reason stated as to insufficiency of the certificates of the United States Chamber of Commerce of Buenos Aires, was warranted;

(2) The general finding for the defendant imported a finding that there was no waiver of valid grounds for refusal of payment other than those stated by the defendant as above described;

(3) A request, to the effect that the defendant could not rely upon reasons for declining to honor the drafts not given when the drafts were presented, properly was refused, it not being found that the defendant had acted in bad faith and no such finding being required as a matter of law.

A defendant in an action of contract is not prevented from relying upon several good defences not inconsistent one with another merely because he has not always put them all forward, if it does not appear that in not putting them all forward he has acted dishonestly or that the other party has been injured thereby in such circumstances as to render it manifestly inequitable for him to assert such defences.

There were no facts found in the action above described that required as a matter of law a finding that the defendant by its words or conduct waived any of its defences.

Description by RUGG, C.J., of the principal characteristics of a letter of credit.

At the hearing of the action above described, it appeared that the certificates produced by the plaintiff showed that the shipments were of " pile " sugar, or sugar in lumps of irregular size and shape and of considerable hardness and not friable, such sugar not being as marketable as American standard granulated sugar, which is made up of grains which do not cohere and " make a free running mass, free of lumps." The judge further found: " There is no standard for American granulated sugar in the same sense that there exist legally established standards of weight and measure, nor is there an exact sameness of shades of color and size of grain among the sugars made respectively by refiners of the United States and regarded unquestioningly by the sugar trade in the United States as standard, but there are certain well understood limits of variation of color, shade, size of grain, polarization and freedom from lumps within which any given sample must come in order to be regarded as standard American granulated sugar. If a sample of sugar is described, and the terms of the description taken all together show that the sample is within those well understood limits, then the sample can be fairly said to be of standard American granulated sugar. The word ' American ' as here used does not connote anything relating to the continent of South America, but relates only to granulated sugars as they are regarded in the United States." *Held*, that

(1) The words of the letter of credit as to the certificate required were not ambiguous on their face;

(2) There was nothing on the record to require the conclusion that those words were used in a technical or trade sense or in any other meaning than according to the common and approved usage of the language;

(3) The words as to the certificate should be construed according to their plain meaning;

(4) A finding, that the certificate furnished by the plaintiff did not fulfil the requirements of the letter of credit, was warranted and was decisive against the plaintiff;

(5) It was not enough that the certificate showed that in chemical analysis the sugar was equal to the standard established by the letter of credit.

Compliance with a requirement of the letter of credit above described, that there be bills of lading " showing Argentine Government Export License," was not made unnecessary by the fact that the sugar could not in fact be exported without such a license.

CONTRACT, by partners doing business in Buenos Aires in the Argentine Republic under the name and style, Moss y Cia, with a declaration as amended in twelve counts. The first, fourth, seventh and tenth counts were based upon allegations that " on or about June 18, 1920, the defendant corporation, for a lawful consideration duly furnished by the plaintiffs to it, agreed with the plaintiffs . . . to honor and pay their sight drafts to the amount of $2,150,000 United States Currency, to be drawn upon it by them . . . Account E. R. Sherburne Company, Boston, covering shipments from Buenos Aires during June and July, 1920, of 5,000 tons of sugar, gross shipping weights, at the price of $430, United States Currency, per one thousand kilos, C. I. F. New York, export duty and all taxes payable by shippers, the documents required being commercial and consular invoices, Inspection Certificate of United States Chamber of Commerce, Buenos Aires, certifying sugar equal in fact to fine American Standard Granulated Sugar, negotiable Bills of Lading showing Argentine Government Export License, and marine war risk insurance certificate showing loss payable in New York, one Consular Invoice and Bill of Lading to be forwarded by the Bank negotiating the draft direct to the defendant, and the certificate to be attached to the draft; " and that, in violation of such agreement, the defendant refused to accept drafts of the plaintiffs, three in the amount of $430,008.60 each, and one in the amount of $860,017.20. The second, fifth, eighth and eleventh counts set forth the basis of the allegations relating to the letter of credit in greater detail. The third, sixth, ninth and twelfth counts were for money had and received by the defendant to the plaintiffs' use. Writ dated November 19, 1920.

In the Superior Court, the action was heard by *Fosdick*, J., without a jury. Material evidence and facts found by the judge are described in the opinion. There was a finding for the defendant. The plaintiffs alleged exceptions.

*J. Wheless* of New York, (*T. Hunt & D. F. Carpenter* with him,) for the plaintiffs.

*J. Smith, Jr.*, (*S. H. Pillsbury & F. S. Moulton* with him,) for the defendant.

RUGG, C.J. · This is an action of contract by merchants resident in Buenos Aires, Argentina, who seek to recover damages against the defendant, a banking institution of this Commonwealth, arising from its refusal to accept and pay four drafts aggregating over $2,000,000 drawn by them on the defendant under a letter of credit issued by it in their favor. The conditions out of which the case arises were the great scarcity of sugar in the United States during a part of 1920, with consequent exceptionally high prices. During that period purchases or contracts for the purchase and import of sugar from countries from which hitherto sugar had not been procured were made. After the middle of that year there was a great drop in the price of sugar and resultant loss to those who had it on hand bought at the earlier prices.

The case was tried before a judge without a jury, who made a general finding for the defendant and also full and complete findings of facts covering many aspects of the conflicting contentions of the parties. The evidence, which was both documentary and oral, is reported in full. The case comes before us on numerous exceptions to rulings of law refused and granted.

There was a request for a general finding for the plaintiffs for the full amount claimed. This presents purely the question of law whether the finding for the defendant can be supported on any reasonable interpretation of the evidence with legitimate inferences therefrom. The general and special findings of the judge in an action at law are to stand if warranted in law upon any possible view of the evidence. It is not the function of this court in an action at law to pass upon the weight of the evidence even though reported in full. The only question for us to decide on that phase of the case is whether upon the evidence, with all rational inferences which might be drawn therefrom, the findings can be sustained. The general finding is conclusive if there is any evidence to support it. *Sparhawk* v. *Sparhawk*, 120 Mass. 390, 392. *Bailey* v. *Marden*, 193 Mass. 277, 279. *Vahey* v. *Bigelow*, 208 Mass. 89, 92. *Seager* v. *Drayton*, 217 Mass. 571, 572. *Timberlake* v. *United Order of the*

*Golden Cross*, 208 Mass. 411, 419. *Evans* v. *County of Middlesex*, 209 Mass. 474, 479. *Atlantic Maritime Co.* v. *Gloucester*, 228 Mass. 519, 522. *Commercial Credit Co.* v. *M. McDonough Co.* 238 Mass. 73, 78.

The rule in equity is different, where on appeal with full report of the evidence it is the duty of this court to decide the case upon its own judgment of the evidence, giving only due weight to the findings theretofore made, and not reversing them unless plainly wrong except in instances where the evidence is documentary, in which cases this court stands in the place of the trial judge in respect to drawing inferences of fact from the evidence. *Lindsey* v. *Bird*, 193 Mass. 200, 201. *Harvey-Watts Co.* v. *Worcester Umbrella Co.* 193 Mass. 138, 143. *Porter* v. *Howes*, 202 Mass. 54, 56. *Hayes* v. *Penn Mutual Life Ins. Co.* 222 Mass. 382, 386. *Attorney General* v. *American Legion of Honor*, 206 Mass. 158, 160. *Rioux* v. *Cronin*, 222 Mass. 131, 134. *Glover* v. *Waltham Laundry Co.* 235 Mass. 330, 333, 334. *Knowles* v. *Knowles*, 205 Mass. 290, 294. That principle has no application to the case at bar because this is an action at law and not a suit in equity.

The letter of credit on which this action is founded was in the form of a cable message from the defendant to the British Bank of South America at Buenos Aires, dated June 15, 1920, and delivered on June 16, 1920, copy being transmitted by the latter to the plaintiffs. The copy, differing in a few slight and immaterial details from the cable, was in these words: " Advise Moss & Co. we open irrevocable credit No. 1475 their favour $2.150.000. U. S. Currency account E. R. Sherburne Company Boston available sight drafts on ourselves covering shipment from Buenos Aires during June July of 5000 tons sugar net shipping weights price $430.u/s/Currency per 10.000 Kilos C. I. F. New York export duty and all taxes payable by shippers credit expires 30th. October. Documents required commercial and consular invoices inspection certificate of United States Chamber of Commerce Buenos Aires certifying sugar equal to fine American Standard granulated sugar, negotiable B/Ladings showing Argentine Government Export License marine war

risk insurance certificates showing loss payable in New York — one consular invoice and B/Lading to be forwarded by Bank negotiating direct to us and certificate attached to draft." On receipt of this copy on June 16, 1920, Moss, the one of the plaintiffs having charge of this transaction, perceived that the letter of credit did not correspond with his understanding of what its terms were to be under the plaintiffs' contract with the E. R. Sherburne Company. He therefore went to the British bank in Buenos Aires and discussed with its second manager the general situation and the particular differences between the cable letter of credit and his understanding of what it ought to be under his contract with Sherburne. These differences were (1) the credit letter stated that the shipping weights were net, whereas the contract called for gross weights; (2) the credit letter stated the price to be $430 for ten thousand kilos, whereas the contract price was $430 per one thousand kilos; (3) the credit letter was silent as to any option by plaintiffs to ship a kind of sugar known as pile instead of granulated, whereas their contract with Sherburne gave them that option. After this conference Moss agreed that the second manager should cable to the defendant a message, which he saw and understood before it was sent, of the tenor following: " Your cable fifteenth Moss state sold 430 dollars American per thousand kilos gross weight not per ten thousand kilos quality Moss option not granulated only." This was sent on June 17, 1920. In the meantime, on June 16, 1920, the defendant sent to the British bank to be transmitted to the plaintiff the following cable, " Refer ours fifteenth credit 1475 advise Moss certificate from Chamber of Commerce must mention without lumps." On June 18, 1920, reply to the British bank cable of the day before was sent by the defendant in these words: " Your cable seventeenth Moss price 430 American dollars per 1000 kilos. Our clients require sugar equal quality and description Standard American Granulated sugar." Both these cables were immediately transmitted to the plaintiffs, who made no reply to either.

Antecedent facts in this connection were that the plaintiffs had on June 4, 1920, obtained from the Argentine

government a license good for ninety days to export twenty-one thousand, five hundred tons of sugar. There could be no export of sugar from Argentina without a license, which was very difficult to obtain, and the refineries with whom the plaintiffs dealt had no such license. At about the same time the plaintiffs procured from two Argentine refineries so called " options " to buy sugar equal in quantity to their export license. They also had engaged steamship freight space for export of eleven thousand tons and had begun on June 11, 1920, to load sugar, and had on June 16, 1920, completed loading two thousand tons of sugar on the steamship Balzac at Rosario, an Argentine port about one hundred and eighty miles above Buenos Aires on the Parana River, from which all the sugar here in question was shipped. They also had arrangements with the United States Chamber of Commerce for inspection and certificates as to chemical analysis, weight, color, dryness, and conditions of containers of the sugar to be shipped on the Balzac. It had been the intention of the plaintiffs previous to the receipt of the letter of credit to ship this sugar to New York on consignment. They had sold several thousand tons to others than Sherburne, and they had the contract with Sherburne to sell that house five thousand tons, performance of which had been held in abeyance pending arrangement by it according to its contract of proper credit for their pay. Upon receipt of the defendant's cabled letter of credit on June 16, 1920, the plaintiffs decided to appropriate to the Sherburne contract the two thousand tons of sugar loaded on the Balzac, which until then they had intended to ship to New York on consignment.

Moss, on June 16, 1920, after the receipt of the letter of credit, had conversation with each of the managers of the sugar refineries, with which his firm had contracts, purporting to take up the " options." No evidence was offered as to the law of Argentina. The judge did not find that the " options " and the acts thereunder imposed any liability on the plaintiffs before the title to specific lots of sugar was transferred to the plaintiffs. He did find that after such transfer the plaintiffs became liable to pay the stipulated price to the refineries.

Moss testified at the trial. The judge found that he was not satisfied with the cabled letter of credit of June 15, 1920, in the three particulars already mentioned, but that he believed that the defendant would modify its terms upon being informed of its want of correspondence with his arrangement with Sherburne. Believing that the letter of credit would be amended in those particulars to meet his understanding, and relying upon that belief but not upon the ₁terms of the letter as cabled, " he decided to begin preparations for, but did not decide to commit the plaintiffs to, the final and complete doing of all things to be done by them under the " Sherburne contract and under the letter of credit as he expected it to be amended. " His intention was to be satisfied only with the terms of a credit that should conform to the terms of the E. R. Sherburne Company contract, and he expected that such a credit would result from the amendment of the terms of the defendant's cable message of June 15, 1920, after the defendant should get the British Bank's message to the defendant of June 17, 1920. He did not in fact accept the defendant's cable message of June 15, 1920, as conforming to the requirements of the E. R. Sherburne Company contract, but, on the contrary, rejected it as not so conforming, and the cable message sent by the British Bank by his authority on June 17, 1920, conveyed to the defendant a new and counter proposition in which, however, were incorporated by inference all but three of the terms of the defendant's cable message of June 15, 1920." An inevitable result of this finding was the further finding that there was no contract between the plaintiffs and the defendant.

This finding of fact as an inference from what was said and done by Moss cannot be pronounced as matter of law without foundation in the evidence.

It is manifest that the letter of credit did not conform to the expectations of the plaintiffs. In the essential particular of price the difference between $430 per ten thousand kilos and $430 per one thousand kilos cannot be thought to have been regarded as negligible. It was of the highest importance. That apparently was a mistake and was

corrected by the defendant and is not now of consequence, but it was on the face of the letter of credit. There is no evidence as to the difference between gross and net weights. That difference between the plaintiffs' contract with Sherburne and the letter of credit meant the difference between receiving pay for the weight of the sacks or bags containing the sugar at the same rate as the sugar, and not receiving pay for that weight. The option to ship pile instead of granulated sugar well might have been vital. However that may be, it was open to the judge to find as a fair inference from all the evidence that the British Bank in sending the cable of June 17, 1920, to the defendant stating these three particulars, either was acting as the agent for the plaintiffs or was stating to the defendant the objections of the plaintiffs to the terms of the letter of credit. In either event it might have been found not to be an acceptance of the terms of the letter of credit but a statement of a counter proposition. The circumstance that the cable of June 17, 1920, to the defendant does not refer to the letter of credit by name is not decisive. A finding that it was intended to be a statement of objections to the letter of credit was warranted. The conversation of Moss with the second manager of the British Bank may have been found to be in substance and effect a refusal to accept the letter of credit as transmitted to the plaintiffs.

It is elementary law that an offer must be accepted in the terms in which it is made in order to become a binding contract, and that a conditional acceptance or one that varies from the offer in any substantial respect is in effect a rejection and is the equivalent of a new proposition. *Wheaton Building & Lumber Co.* v. *Boston*, 204 Mass. 218, 224. *Kehlor Flour Mills Co.* v. *Linden*, 230 Mass. 119, 123. *Stroock Plush Co.* v. *New England Cotton Yarn Co.* 213 Mass. 354. *Lawrence* v. *Rosenberg*, 238 Mass. 138, 141.

Since the offer contained in the defendant's original letter of credit of June 15, 1920, has been found not to have been accepted but in effect to have been rejected, the defendant then had the right to add to the terms of the first letter of credit the further condition that the certificate from the

United States Chamber of Commerce " must mention without lumps." There is no contention that there was compliance by the plaintiffs with the terms of the letter of credit as thus modified.

It has been earnestly argued that the letter of credit of June 15, 1920, was accepted by the plaintiffs and thus became binding on the defendant. The case is considered also on that assumption. The vital question then is whether the plaintiffs conformed to its terms in every essential particular. The plaintiffs drew on the defendant two drafts with accompanying documents covering the shipment of sugar on the Balzac, one draft with accompanying documents covering a shipment on the Nile, and a fourth draft with accompanying documents covering a shipment on the Siddons. The shipments were all made to New York and aggregated five thousand tons. In due course the four drafts were seasonably presented to the defendant and payment was refused. When the first of these drafts was presented to the defendant, it wrote to the New York bank through which payment was sought that it refused payment " inasmuch as these documents were not as specified in our Letter of Credit " and that the merchandise did not conform to contract. When the second and third drafts were presented to the defendant, it wrote to the New York banks through which collection was sought in substance that it refused payment because the letter of credit on which the drafts were drawn by the plaintiffs specified sugar equal to fine American standard granulated sugar without lumps, and certificate to that effect by the United States Chamber of Commerce of Buenos Aires must accompany the drafts. The notarial certificates protesting these three drafts for nonpayment stated that payment was refused as to the first because it was " not drawn according to credit," and as to the second and third because " Documents not in order." The fourth draft does not appear to have been presented to the defendant until presented for acceptance by the notary and by him protested. His notarial certificate of protest on the last draft stated that he was answered that payment was " refused on account of certificate of United States

Chamber of Commerce of Buenos Aires not certifying that the sugar is equal to fine American standard granulated. sugar, without lumps as specified in Letter of Credit opened in favor of Moss & Company."

There was ample time for the plaintiffs to ascertain the precise grounds on which the defendant asserted that the drafts and accompanying documents did not comply with the requirements of the letter of credit before its expiration, but no effort to that end was made.

The judge found that there was no estoppel against the defendant which confined it to the reason stated as to insufficiency of the certificates of the United States Chamber of Commerce of Buenos Aires. The general finding for the defendant imports also a finding that there was no waiver of other valid reasons.

There was no error of law in these findings nor in the denial of the plaintiffs' request to the effect that the defendant cannot now rely upon reasons for declining to honor the drafts not given when the drafts were presented. When one in stating objections consciously fails to disclose a ground which can easily be remedied, and which misleads another to his harm, and which is contrary to justice and good morals, then an estoppel may be found. But one is not prevented from relying upon good defences not inconsistent one with another simply because he has not always put them all forward, when it does not appear that he has acted dishonestly or that the other party has been injured thereby in such circumstances as to render it manifestly inequitable for him to assert such defences. *Brown* v. *Henry*, 172 Mass. 559, 567. *Price* v. *Rosenberg*, 200 Mass. 36, 43. *Bates* v. *Cashman*, 230 Mass. 167. *Randall* v. *Peerless Motor Car Co.* 212 Mass. 352, 376. *Railway Co.* v. *McCarthy*, 96 U. S. 258, 267.

There is nothing in this record which as matter of law shows bad faith on the part of the defendant or prevents it from defending its refusal to accept the drafts on all available grounds existing on the face of the papers. *Rollins* v. *Bay View Auto Parts Co.* 239 Mass. 414, 421, 422.

Waiver is the intentional relinquishment of a known right.

The circumstances fall short of requiring a finding that the defendant by its words or conduct waived any of its defences. Whether there has been waiver is usually a question of fact. The finding is against the plaintiffs. *St. John Brothers Co.* v. *Falkson*, 237 Mass. 399.

The question for decision upon this branch of the case is whether the plaintiffs conformed to the requirements of the letter of credit in respect to the documents accompanying the letter of credit. This involves consideration of the nature of a letter of credit and its essential characteristics.

A letter of credit is a well known instrumentality of commerce. No particular form is prescribed for it. It is a contract in writing. It is governed by the same general principles of law as are all other contracts in writing. To attempt a comprehensive definition applicable to all appropriate cases and not exclusive of others in use or likely to come into use with changes in commercial and banking methods would be difficult. It has been said that it is not " the business of practical jurisprudence to give definitions or lay down abstract propositions, but to give the rule applicable to the facts proved." *Lee* v. *Kilburn*, 3 Gray, 594, 599. Moreover, letters of credit are extensively used in commerce. Their nature and use ought to be kept as free as possible from narrowing statements of limitations and from judicial dicta not necessary to a particular decision. They should not be bound by definition so as to become incapable of growth and change in accordance with the development of legitimate business practices.

It is sufficient for present purposes to say that a letter of credit is an offer by a bank or other financial agency to be bound to the person to whom it is directed, when accepted and acted upon by the latter according to its stipulations. It commonly is issued at the request of a third person who in some way indemnifies the bank against its obligations incurred or to be incurred under the letter of credit, and who gives directions to the bank as to its terms. Although not a party to the letter of credit, he is the one behind the transaction. It is in his interest or for his benefit that the business or other financial adventure is to be undertaken, to which

the addressee of the letter of credit is invited.   He usually is relieved of all liability to the bank unless it conforms strictly to the terms of the letter of credit in dealing with the person to whom it is directed.   If that person is not satisfied with its terms he is under no obligation to act upon it but is entirely at liberty to decline.   If he accepts it and acts under it, he is bound to conform to its requirements in every particular.   It is in substance an authority to him to draw on the bank in accordance with the terms stated, and a promise by the bank to accept and pay at maturity bills or drafts so drawn.   There is no promise to pay unless drafts are in strict conformity to the authority conferred. The letter of credit, when so accepted and acted upon by the person in whose favor it is issued, becomes a contract between them wholly independent of the relation between the writer of the letter of credit and its customer by whose procurement the letter was issued except perhaps in so far as these may be incorporated in the letter.   The writer of the letter of credit also has no immediate concern with the relations between the person to whom it is addressed and by whom it is accepted on the one side and the person with whom he has commercial transactions on the other side. The writer of the letter is bound strictly to the terms of his contract as expressed in its letter.   The bank as the writer of the letter of credit will not be bound to accept and pay bills or drafts drawn against it unless the holder of the letter pursues and conforms in every material particular to the authority conferred therein.   It therefore has come to be the law that letters of credit are construed with some strictness to the end that the rights of those directly parties to them and of those remotely concerned with them as purchasers or indemnitors of the bank respecting its obligations under them may be preserved and the interests of no one of them put in jeopardy.   *Murdock* v. *Mills,* 11 Met. 5, 10.   *Bank of Montreal* v. *Recknagel,* 109 N. Y. 482.   *Lamborn* v. *Lake Shore Banking & Trust Co.* 196 App. Div. (N. Y.) 504, affirmed 231 N. Y. 616.   *Filley* v. *Pope,* 115 U. S. 213. *Brown, Graves & Co.* v. *Ambler,* 66 Md. 391, 396.   *Brazilian & Portuguese Bank, Ltd.* v. *British & American Exchange*

*Banking Corp. Ltd.* 18 L. T. R. 823.    *International Banking Corp.* v. *Irving National Bank,* 274 Fed. Rep. 122, affirmed 283 Fed. Rep. 103.    *Lindley* v. *First National Bank of Waterloo,* 76 Iowa, 629, 632.    *American Steel Co.* v. *Irving National Bank,* 266 Fed. Rep. 41.    *Border National Bank of Eagle Pass* v. *American National Bank of San Francisco,* 282 Fed. Rep. 73.    *Donald H. Scott & Co. Ltd.* v. *Barclays Bank, Ltd.* [1923] 2 K. B. 1, 11.    See 35 Harv. Law Rev. 539, 715, and cases there collected.

It is contended that there are several particulars in which there was failure on the part of the plaintiffs to meet the conditions stated in the letter of credit.    The first of these is conclusive against the plaintiffs.

There was requirement of " inspection certificate of United States Chamber of Commerce Buenos Aires certifying sugar equal to fine American Standard granulated sugar."    The finding in this respect is that none of the certificates furnished by the plaintiffs describe sugars which are in fact equal to fine American standard granulated sugar or equal in quality and description to standard American granulated sugar. There is a further finding that " There is no standard for American granulated sugar in the same sense that there exist legally established standards of weight and measure, nor is there an exact sameness of shades of color and size of grain among the sugars made respectively by refiners of the United States and regarded unquestioningly by the sugar trade in the United States as standard, but there are certain well understood limits of variation of color, shade, size of grain, polarization and freedom from lumps within which any given sample must come in order to be regarded as standard American granulated sugar.    If a sample of sugar is described, and the terms of the description taken all together show that the sample is within those well understood limits, then the sample can be fairly said to be of standard American granulated sugar.    The word ' American ' as here used does not, I find on all the evidence, connote anything relating to the continent of South America, but relates only to granulated sugars as they are regarded in the United States.    Polarization is the term used to express

the percentage of pure sugar content in a given mass of sugar as distinguished from its content of moisture, glucose, ash and other substances foreign to pure sugar."

All the sugar shipped by the plaintiffs was known as pile sugar. Pile sugar in some respects has the same terms of description as American standard granulated sugar and in other respects has different terms of description. The differences are due to differences in the process of manufacture. The pile sugar is in lumps of irregular size and shape and of considerable hardness and not friable. The breaking of the lumps and attrition due to shipping produce " a detritus made up of separated grains and fragments of grains which is not the same as American standard granulated sugar in respect of the size and shape of its constituent parts." American standard granulated sugar is made up of grains which do not cohere and " make a free running mass, free from lumps." It has been found that " In the Spring of 1920, pile sugar was not widely known in the United States, and until that time little or no sugar had been imported from Argentina. On account of its characteristic lumps, and of its being comparatively unknown here, pile sugar was not as marketable here at the times in 1920 when the various Chamber of Commerce certificates were made, as was American standard granulated sugar, nor could it properly be marketed under the designation ' American standard granulated sugar.' If American standard granulated sugar is exposed to moisture, lumps are likely to form in it. If these lumps are friable, their presence does not reduce the mass below standard requirements; but if the lumps are not friable, the mass is no longer standard, but is damaged sugar and is so called. The characteristics of being free running and having grains of approximately uniform size, and of being free from hard lumps, are important to granulated sugars intended for use in the United States."

Whether the finding and ruling were right, that the true meaning and construction of the words of the letter of credit requiring a certificate to the effect that " sugar equal to fine American Standard granulated sugar " is that the certificate " must state in so many words, and leaving nothing to

inference, that the sugar inspected was equal to fine American Standard granulated sugar," need not be decided. The words of the letter of credit are not ambiguous on their face. They do not appear to need interpretation. They state requirements comprehensible to the ordinary mind. It is not easy further to define such simple words. They mean that the sugar must be of a kind on a par in appearance and in all inherent and marketable qualities with the specified American grade of sugar.

There is nothing in the record to require the conclusion that these words of the letter of credit were used in a technical or trade sense or in any other meaning than according to the common and approved usage of the language.

The preceding correspondence and transactions between the parties does not render necessary a finding that they were used in any other than their obvious signification. When a contract is so phrased as to leave its meaning uncertain, obscure or doubtful, evidence of the conditions attendant upon its execution are admissible to ascertain the true meaning of its language, but not to enlarge or vary its terms. *Jennings* v. *Puffer*, 203 Mass. 534, 538. *Derby Desk Co.* v. *Conners Brothers Construction Co.* 204 Mass. 461, 470. *Waldstein* v. *Dooskin*, 220 Mass. 232, 235. *Linton* v. *Noonan*, 238 Mass. 31, 40. *Eustace* v. *Dickey*, 240 Mass. 55, 72. Giving full weight to this principle, no error is disclosed in the findings or rulings. So far as light is thrown upon the transaction by the earlier dealings of the parties, it tends rather to support the contentions of the defendant than of the plaintiffs.

Even if the principle that a written instrument is construed most strongly against the person writing be applied, no difference is made in the result. *Bascom* v. *Smith*, 164 Mass. 61, 76. *Koshland* v. *Columbia Ins. Co.* 237 Mass. 467, 472. The words of this contract are not ambiguous nor open to two constructions.

The finding that none of the certificates describe sugar equal in quality or description to standard American granulated sugar is decisive against the plaintiffs on this branch of the case. It was fully warranted by the evidence. The

contention of the plaintiffs in substance is that it is enough that the certificate showed that in chemical analysis the sugar was equal to the standard established by the letter of credit. But that is not a compliance with the letter of credit. Equality in this connection implies similarity in appearance and in quality of granulation as well as in percentage of pure sugar.

The conclusion that the plaintiffs did not conform to the letter of credit in procuring certificate that the sugar shipped was " equal to fine American Standard granulated sugar " is strongly supported by *Murdock* v. *Mills,* 11 Met. 5; *Lamborn* v. *Lake Shore Banking & Trust Co.* 196 App. Div. (N. Y.) 504, affirmed in 231 N. Y. 616; *International Banking Corp.* v. *Irving National Bank,* 274 Fed. Rep. 122, affirmed in 283 Fed. Rep. 103; *National City Bank* v. *Seattle National Bank,* 121 Wash. 476.

The letter of credit also required that there be bills of lading " showing Argentine Government Export License." Confessedly there was no literal compliance with this stipulation. It is not enough that the sugar could not in fact be exported without such a license. When the writer of the letter of credit makes compliance with that requirement a condition precedent to the establishment of its liability, there must be such compliance before it can be held liable. *Filley* v. *Pope,* 115 U. S. 213.

Other grounds of defence need not be examined.

In view of the principles already stated and the conclusions reached, it is not necessary to recite the various exceptions one by one. They all are comprehended in what has been said. No error of law vital to the plaintiffs' contentions is disclosed.

*Exceptions overruled.*